

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-24-2008

# Fahy v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 03-9008

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Fahy v. Horn" (2008). *2008 Decisions.* Paper 1646.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1646

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 03-9008

HENRY FAHY

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections; CONNER BLAINE, JR., Superintendent of
the State Correctional Institution at Greene; JOSEPH P.
MAZURKIEWICZ, Superintendent of the State Correctional
Institution at Rockview,
Appellants

Case No: 03-9009

HENRY FAHY,
Appellant

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections; CONNER BLAINE, JR., Superintendent of
the State Correctional Institution at Greene; JOSEPH P.
MAZURKIEWICZ, Superintendent of the State Correctional
Institution at Rockview

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(E.D. Pa, No. 99-cv-05086)
District Judge: Honorable Norma L. Shapiro

Argued October 16, 2007

Before: AMBRO, SMITH, and COWEN, *Circuit Judges*.

Counsel:

Marilyn F. Murray (Argued)
Thomas W. Dolgenos
Office of District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499
*Counsel for Martin Horn, et al.*

Matthew C. Lawry
Billy H. Nolas (Argued)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106
*Counsel for Henry Fahy*

(Filed: January 24, 2008)

OPINION OF THE COURT

SMITH, *Circuit Judge*.

Twenty-seven years after the murder of twelve-year-old Nicoletta Caserta, the case of Henry Fahy returns to this Court, and possibly not for the last time. The Commonwealth of Pennsylvania ("Commonwealth") appeals from the order of the District Court granting Fahy's Petition for Writ of Habeas Corpus, which vacated his death sentence. Fahy cross-appeals from the District Court's denial of his guilt phase claims. Today, we vacate the judgment of the District Court to the extent that the writ was granted on the basis of *Mills v. Maryland*, 486 U.S. 367 (1988),[1] and we remand the matter to

---

[1] In *Mills v. Maryland*, the Supreme Court announced that the Constitution prohibits a state from requiring jurors to agree unanimously that a particular mitigating circumstance exists before they can consider that circumstance in their determination of whether to impose the death penalty or life imprisonment. *Mills*, 486 U.S. 367.

Fahy alleged that the jury instructions at the penalty phase of his proceeding, as well as the verdict sheet, unconstitutionally led the jury to believe that they had to find any mitigating

the District Court to consider sentencing-phase issues which that court did not address at the time it granted habeas relief. We affirm the District Court's determination that the guilt phase claims do not warrant habeas relief.

## I.

The factual background and procedural history that follow are lengthy and complex.

The body of Nicky Caserta was found by her stepfather on the late afternoon of January 9, 1981. The twelve-year-old was found sprawled across the floor of her basement with a t-shirt and an electrical cord wrapped tightly around her neck, multiple tears to the vagina and rectum, and eighteen stab wounds to the chest area. A medical examiner confirmed these findings and ruled her death a homicide.

On January 29, 1981, police interviewed Fahy's

---

circumstance unanimously before they could give effect to that circumstance. Fahy now concedes that in light of *Beard v. Banks*, 126 S.Ct. 2572 (2006), which held that *Mills* was not retroactively applicable on collateral review, he cannot obtain relief under *Mills*.

In light of *Beard v. Banks*, this Court will vacate the judgment of the District Court to the extent that the writ was granted on the *Mills* claim.

girlfriend, Rosemarie Kelleher, who lived across the street from Nicky Caserta and was also her aunt. Fahy lived with Kelleher. The interview of Kelleher concerned an alleged sexual assault by Fahy upon her six-year old son. She called Fahy and requested that he come down to the station for questioning. He arrived shortly thereafter. Police then questioned Fahy and advised him that they had two warrants for his arrest on charges of rape. He was subsequently placed under arrest. After his arrest, Fahy was questioned regarding the rape and murder of Nicky Caserta. He ultimately gave the police a detailed confession and led them to the sewer where he had disposed of the knife used to kill her. Fahy subsequently denied making statements to the police, but his motion to suppress those statements was denied.

On January 24, 1983, Fahy was tried by a jury for the rape and murder of Nicky Caserta, with the Honorable Albert F. Sabo, Court of Common Pleas of Philadelphia County, presiding. During the guilt phase of the proceeding, the jury heard evidence that led to guilty verdicts on all counts—first-degree murder, rape, burglary, and possession of an instrument of crime.

The proceedings then entered the penalty phase. The prosecution, in seeking the death penalty, presented evidence intended to support three aggravating circumstances under Pennsylvania's death penalty statute: 1) "The defendant committed a killing during the perpetration of a felony," 42

Pa.C.S. § 9711(d)(6); 2) "The defendant has a significant history of felony convictions involving the use or threat of violence to the person," 42 Pa.C.S. § 9711(d)(9); and 3) "The offense was committed by means of torture," 42 Pa.C.S. § 9711(d)(8). The jury determined that all three aggravating circumstances were present. The defense presented evidence of four mitigating circumstances and the jury found that two were present: 1) "The defendant was under the influence of extreme mental or emotional disturbance," 42 Pa.C.S. § 9711(e)(2); and 2) "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired," 42 Pa.C.S. § 9711(e)(3). The jury determined that Fahy should receive a sentence of death, and on November 2, 1982, Judge Sabo formally imposed the death sentence for the murder conviction.[2] On direct appeal, the Pennsylvania Supreme Court upheld the convictions and sentences. *Commonwealth v. Fahy*, 516 A.2d 689 (Pa. 1986) ("Fahy 1").

On March 18, 1987, Fahy filed a pro se petition under the

---

[2] Judge Sabo imposed ten to twenty years for the rape conviction, ten to twenty years for the burglary conviction, and two and one-half to five years for the weapons conviction. Judge Sabo ordered the burglary and rape convictions to run concurrently with each other but consecutively to the murder conviction. The weapons conviction was to run consecutively to the burglary and rape convictions.

Post Conviction Hearing Act ("PCHA"), 42 Pa.C.S. § 9541 (superseded and replaced by the Post Conviction Relief Act ("PCRA") in 1988) concerning his murder conviction as well as his conviction in an unrelated rape case ("PCRA #1"). As a result, the petition was procedurally defective. It was transferred to Judge Sabo, who dismissed it without prejudice to Fahy's right to refile separate petitions. Fahy took no action for four years.

The Governor issued a warrant of execution for Fahy on November 21, 1991. Judge Sabo denied Fahy's application for a stay. On appeal, the Pennsylvania Supreme Court granted a stay of execution and remanded to Judge Sabo pursuant to the PCRA for a hearing to determine whether trial counsel had been ineffective for failing to object to a jury instruction regarding the aggravating circumstance of the killing of another committed by means of torture, which did not provide a definition of the term "torture."[3] Judge Sabo denied the PCRA petition ("PCRA #2") and upheld the sentence of death. Fahy appealed. The Pennsylvania Supreme Court affirmed the denial of Fahy's petition on July 1, 1994.

---

[3] In the wake of the Pennsylvania Supreme Court's remand, Fahy's counsel, apparently mindful that all claims not raised in the first post-conviction petition are waived, filed a motion on April 14, 1992, with the Supreme Court asking that it clarify its order to expressly encompass claims in addition to the torture issue. The Court denied the motion.

On June 5, 1995, the Governor issued a second death warrant. On July 7, 1995, the Pennsylvania Supreme Court granted a stay of execution to allow Fahy to file another PCRA petition ("PCRA #3").[4] This third PCRA petition was filed on August 4, 1995, with a supplemental petition filed on September 12, 1995. Judge Sabo held an evidentiary hearing on the claims raised in PCRA #3 and thereafter denied the petition. Fahy appealed to the Pennsylvania Supreme Court.

While this appeal was pending, Fahy filed a handwritten pro se motion on December 5, 1995, asking the PCRA court to allow him to withdraw his appeal and to waive all collateral proceedings so that his death sentence could be carried out.[5] Because the Pennsylvania Supreme Court then had jurisdiction over PCRA #3, Judge Sabo forwarded the letter to that Court. On July 17, 1996, the Supreme Court remanded the appeal "for a colloquy to determine whether petitioner fully understands the

---

[4] Fahy also requested that the District Court stay his execution to permit him to file a habeas corpus petition. Because the state court had already issued a stay of execution, District Judge Shapiro dismissed the habeas petition without prejudice for failure to exhaust state remedies.

[5] On March 22, 1996, upon learning of Fahy's pro se motion, his counsel (Mr. Gelman and Mr. Natali) filed a motion for the PCRA court to determine Fahy's competency to waive his rights. On October 23, 1996, the PCRA court denied the motion.

consequences of his request to withdraw his appeal and to waive all collateral proceedings." Pursuant to the remand, on August 2, 1996, Judge Sabo purported to conduct a hearing consistent with the direction from the Supreme Court. At that time, Fahy told Judge Sabo that he desired an additional week to consider his request to waive all collateral proceedings. Judge Sabo granted Fahy the extra time, and during that week Fahy signed a sworn affidavit, prepared by his counsel, stating that he no longer wished to waive his appellate rights, that he wanted to proceed with his appeal, and that he desired continued representation by counsel. However, when Fahy appeared before Judge Sabo on August 9, he stated that he had again changed his mind, *i.e.*, that he did not want to be represented by his attorneys and that he did not want to pursue any further appeals. After asking Fahy several questions, Judge Sabo declared, "All right, Mr. Fahy, I will inform the Supreme Court of Pennsylvania that you were knowingly waiving all your appellate rights and all your PCRA rights."

Twelve days later, Fahy's attorneys advised the Pennsylvania Supreme Court that Fahy was again pursuing his appeal of the denial of PCRA #3 because the alleged waiver was involuntary. On September 17, 1997, the Pennsylvania Supreme Court unanimously affirmed Judge Sabo's determination that Fahy had validly waived his right to all appellate and collateral proceedings. The Court never reached the merits of his appeal from the denial of PCRA #3. *Commonwealth v. Fahy*, 700 A.2d 1256 (Pa. 1997) ("Fahy 3").

9

Thereafter, on November 12, 1997, Fahy filed a fourth PCRA petition ("PCRA #4"). Judge Sabo dismissed the petition on two grounds: 1) failing to set forth a prima facie case that a miscarriage of justice had occurred; and 2) timeliness. The Pennsylvania Supreme Court affirmed Judge Sabo's order dismissing PCRA #4. *Commonwealth v. Fahy*, 737 A.2d 214 (Pa. 1999) ("Fahy 4").[6]

Fahy then filed a motion for a stay of execution, together with an amended habeas petition in the District Court. On October 14, 1999, the District Court stayed the execution for a period of 120 days and determined that the amended petition should be treated as a first, and not a successive, habeas petition because the first application was dismissed without prejudice. Then-Chief Judge Giles, acting as emergency motions judge, determined that despite the one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the habeas petition was timely by virtue of both statutory and equitable tolling. *See Fahy v. Horn*, 240 F.3d 239

---

[6] The Supreme Court specifically declined to address the issues of whether Fahy's attorneys had authority to file the fourth PCRA petition for collateral relief or whether Fahy did withdraw, or even could withdraw, his waiver of collateral and appellate proceedings. The Court assumed *arguendo* that Fahy had renounced his waiver, but that he was still not entitled to relief because his petition was untimely. *Fahy 4*, 737 A.2d at 225 n.9.

10

(3d Cir. 2001). He further stated that his decision would be subject to modification by District Judge Shapiro; she later agreed that Fahy's amended habeas petition was properly filed. The Commonwealth appealed. On appeal, this Court rejected statutory tolling but affirmed the application of equitable tolling. *Id.* at 246. The case then returned to the District Court.

## B. District Court Decision

In light of the stay and the equitable tolling, Fahy's federal habeas case was assigned to Judge Shapiro. She found that Fahy was competent when he waived his right to appellate and collateral review during the state court proceedings, but that the evidence established that Fahy either was, or believed he was, improperly induced to waive his rights. She also concluded that Fahy's claims were not otherwise procedurally defaulted. Upon reaching the merits, the District Court ruled that Fahy's fourth claim, a *Mills* claim, was meritorious, and she therefore vacated his death sentence. As a result, the District Court did not reach the remainder of Fahy's claims alleging constitutional error in the sentencing phase of his trial.[7] The

---

[7] Both parties to this appeal agree that, if this Court finds Fahy's waiver to be invalid and his claims not otherwise procedurally barred, this matter should be remanded to the District Court to consider the remaining sentencing-phase claims in light of our vacatur of relief on the *Mills* claim. The remaining claims are as follows:

CLAIM III. Ineffective assistance of counsel during sentencing (penalty) phase of trial for: A) Failure to develop and present mitigating evidence; B) Failure to contemporaneously object or request an instruction in response to prosecutor's suggestion that Fahy was a "serial pedophile"; C) Failure to contemporaneously object or request an instruction in response to prosecutor's suggestion that Fahy was involved in an incestuous relationship with the victim; and, D) Discussion of the possibility of parole and failure to contemporaneously object or request an instruction in response to prosecutor's arguments concerning Fahy's future dangerousness and his possibility of parole.

CLAIM VII. Prosecutorial misconduct during sentencing/penalty phase of the trial for: A) Improperly interjecting unadjudicated criminal conduct; B) Improperly arguing Fahy's future dangerousness to jury by asking, "How many more people does he have to kill?"; and, C) Improperly denigrating Fahy's mitigating evidence.

CLAIM VIII. Prosecutor's comment "No sentence is final until it's appealed," diminished the jury's sense of responsibility for imposing sentence in violation of Fahy's rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

CLAIM IX. Jury was unconstitutionally

District Court denied the petition in all other respects.

II.

---

instructed on the "torture" aggravating circumstance.

CLAIM X. No definitive proof that the jury found the "torture" aggravating circumstance.

CLAIM XI. The "proportionality review" performed by the Supreme Court of Pennsylvania did not provide Fahy meaningful appellate review as mandated by Pennsylvania and federal law.

CLAIM XIII. Trial court failed to properly instruct the jury on mitigating factors.

CLAIM XIV. Jury was not permitted to consider and give effect to the non-statutory mitigating evidence that was presented.

CLAIM XV. Trial court violated *Simmons v. South Carolina*, 512 U.S. 154 (1994), in failing to accurately instruct the sentencing jury that, if sentenced to life, Fahy would be parole ineligible.

CLAIM XVI. Aggravating circumstance instruction (d)(9), "significant history of felony convictions involving the use of or threat of violence to the person," is unconstitutionally vague.

*Fahy v. Horn*, 2003 WL 22017231, *35–36 (E.D.Pa. Aug. 26, 2003).

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254; this Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. We apply a plenary standard of review when a district court dismisses a habeas petition based on a review of the state court record without holding an evidentiary hearing. *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (citing *Zilich v. Reid*, 36 F.3d 317, 320 (3d Cir. 1994)).[8] Our review is also plenary as to a district court's determinations regarding exhaustion, procedural default, and nonretroactivity. *Albrecht v. Horn*, 485 F.3d 103, 114 (3d Cir. 2007).

## III.

Fahy raised twenty-one claims for relief in his amended habeas petition, four of which were later withdrawn. Prior to reaching any of the claims on the merits, the District Court addressed threshold issues—first, the validity of Fahy's state court waiver, and second, whether his claims were otherwise procedurally defaulted.

### A. Waiver

The Commonwealth argued that Fahy's state court

---

[8] The District Court did hold an evidentiary hearing to resolve waiver issues, but no evidentiary hearing was held on the habeas petition itself.

waiver prohibited consideration of the merits of his habeas claims because Fahy had waived his rights to appellate and collateral review and was not free to change his mind at will. The Commonwealth further argued that 28 U.S.C. § 2254(d),[9] required the District Court to accord deference to the state court's determination that Fahy's waiver was valid. Fahy

_____

[9] AEDPA made significant revisions to the law of habeas corpus practiced within the federal judicial system. One such revision is § 2254(d), which limits a federal court's authority to grant writs of habeas corpus on behalf of persons in state custody. Specifically, the section delineates three standards of review that constrain the federal courts:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

countered by arguing that he was coerced into waiving his rights and, as such, the waiver was invalid.

The District Court acknowledged that AEDPA heightened the level of deference accorded to state court determinations; however, it found that § 2254(d) was inapplicable to the waiver issue. It recognized that § 2254(d) pertained to any "claim" by the habeas petitioner "that was adjudicated on the merits . . . ." 28 U.S.C. § 2254(d). Following this Court's precedent, the District Court defined the term "claim" in § 2254(d) as a substantive request for habeas relief. *See Cristin v. Brennan*, 281 F.3d 404, 413, 417–18 (3d Cir. 2002). The District Court concluded that because the waiver issue did not entitle Fahy to relief on the merits of his habeas petition, it was not required to accord deference to the state court's conclusion under § 2254(d).

We agree with the District Court's assessment that it need not defer under § 2254(d) to the state court's determination that Fahy's waiver was valid. *Cristin* instructs that a "claim" is that which, if granted, provides entitlement to relief on the merits. 281 F.3d at 417–18. Because resolution of the question as to whether Fahy's waiver was valid will not entitle him to relief on the merits of his habeas petition, the waiver question is not a "claim." Therefore, the state court's determination that the waiver was valid is not entitled to deference under § 2254(d).

The Commonwealth additionally argued that the state

16

court finding that Fahy's waiver was knowing and voluntary should be presumed correct under § 2254(e)(1) because it was litigated, considered, and unequivocally rejected.[10] The District Court considered whether the factual determinations made in the waiver proceeding were entitled to deference under 28 U.S.C. § 2254(e)(1), which reads in relevant part:

> In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue by a State court

---

[10]   As the District Court recognized, this assertion is supported by language in the Pennsylvania Supreme Court decisions. In the decision affirming the dismissal of Fahy's fourth PCRA petition, the Pennsylvania Supreme Court said,

> [T]he assertion that his guards influenced the validity of [Fahy]'s waiver was previously litigated and rejected by this court. On appeal from the PCRA court's determination that [Fahy]'s waiver was valid, [he] specifically argued that his decision to waive appellate and collateral review was motivated by abuse and harassment by his guards, i.e., the conditions of his incarceration. This court nevertheless found [Fahy]'s waiver of his rights to be valid.

*Fahy 4*, 737 A.2d at 219 (citing *Fahy 3*, 700 A.2d at 1259).

17

shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*Id.* The District Court acknowledged that a federal habeas court must afford a state court's factual findings a presumption of correctness and that the presumption applies to the factual determinations of state trial and appellate courts. *See Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001). However, it determined that deference could not be accorded to the finding that Fahy's waiver was knowing and voluntary. The District Court identified that a valid waiver of post-conviction relief requires that a court determine both that the petitioner has an ability to understand, *i.e.*, competency, and that the petitioner understands and freely chooses to waive. *See Gilmore v. Utah*, 429 U.S. 1012 (1976). The District Court then found that a competency determination had not been made, and therefore no deference under § 2254(e)(1) need be given to the state court's finding of competency or finding that Fahy's waiver was knowing, intelligent and voluntary.

We disagree with the District Court's position that no competency determination was made. In this case, Judge Sabo explicitly concluded that Fahy was competent. At the end of the waiver colloquy Judge Sabo stated: "I am making the decision he's fully competent, he knows what he's doing." Here, the

18

state court's explicit[11] factual finding that Fahy was competent is presumed correct, unless Fahy rebuts "the presumption of correctness by clear and convincing evidence." *See* § 2254(e)(1).

The District Court suggests that Fahy rebutted this presumption because "no real competency determination was undertaken." However, not every case calls for such a determination. *See Godinez v. Moran*, 509 U.S. 389, 402 n.13 (1993). The Supreme Court has stated that "a court is [not] required to make a competency determination in every case . . . . As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's

---

[11] Our Court has recognized that competency is a state court factual finding that, if supported by the record, is presumed correct. *Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007) (citing *Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (citation omitted)). A finding of competency may be implicit or explicit. *Id*. In this case, Judge Sabo found that Fahy had validly waived any post-conviction relief. Because a valid waiver requires that a court determine both the petitioner's *ability* to understand, *i.e.*, competency, and that the petitioner *does* understand and *freely chooses* to waive, a finding of a valid waiver presupposes a finding of competency. *See id.* (citing *Gilmore v. Utah*, 429 U.S. 1012 (1976)). Therefore, even if Judge Sabo had not made an explicit finding of competency, this implicit finding of competency is presumed correct under § 2254(e)(1) to the same extent as express factual findings. *Id.*

19

competence." *Id.* Here, the record reveals insufficient indicia of incompetency to compel the PCRA court to hold a competency hearing;[12] and we are not aware of any requirement that mandates the PCRA court to set forth the specific factual findings that give rise to a determination of competency—this is particularly true given our position on implicit factual findings. *See Taylor*, 504 F.3d at 433; *see also supra* note 11.

In addition to our disagreement with the District Court's position that no competency determination was made, we believe *Godinez* makes the District Court's reliance on the absence of a competency determination problematic. When the District Court used the supposed absence of a competency determination as the standard for determining that the finding of knowing and voluntary waiver was not entitled to § 2254(e)(1) deference, it erred. Because the District Court applied the

---

[12] Indeed, in *Taylor v. Horn*, this Court relied on the trial court's own observations and interactions with the defendant in upholding the trial court's decision not to hold a competency hearing. 504 F.3d at 433–34 (holding that the court's decision not to hold a competency hearing before accepting petitioner's guilty plea comported with federal standards of due process because "[t]he record shows that throughout the proceedings Taylor was able to engage with counsel and respond to the trial court's inquiries, and that trial counsel never expressed concern over Taylor's competency."). Similarly, Judge Sabo relied on his personal interaction with Fahy, Fahy's response to questions, and Fahy's insistence that he was competent.

20

wrong standard, this Court exercises plenary review over what deference is to be accorded the state court's voluntariness determination.[13]

Unlike the pre-AEDPA framework, the District Court recognized that the current § 2254(e),[14] read literally, eliminates

---

[13] The question of whether the District Court applied the correct standard of review to the PCRA court's voluntariness determination is a question of law subject to de novo review by this Court. *See Taylor*, 504 F.3d at 428 ("We review *de novo* whether the District Court appropriately applied AEDPA's standards of review.").

[14] 28 U.S.C. § 2254(e) provides:

(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
(A) the claim relies on—
      (i) a new rule of constitutional law,

the requirement that findings must be in writing, and drops
federal standards relevant to the state court's fact-finding
process and evidentiary record, including evidentiary hearing
requirements.  Our Court has already acknowledged as much.
In *Lambert v. Blackwell*, we noted that the habeas statute no
longer explicitly conditions federal deference to state court
factual findings on whether the state court held a hearing.  387
F.3d 210, 238 (3d Cir. 2004).  However, we have declined to
conclude "that state court . . . procedures are entirely irrelevant
in a federal court's habeas review of state court determinations."
*Id.*  As one commentator has noted:

> Bluntly stated, it appears that the federal habeas
> courts must accept state court findings at face
> value—no questions asked.  A change of that kind

made retroactive to cases on
collateral review by the Supreme
Court, that was previously
unavailable; or
(ii) a factual predicate that could
not have been previously
discovered through the exercise of
due diligence; and
(B) the facts underlying the claim would be
sufficient to establish by clear and convincing
evidence that but for constitutional error, no
reasonable factfinder would have found the
applicant guilty of the underlying offense.

would be dramatic and not something that anyone would lightly read into the new law. . . . I read § 2254(e)(1) to drop the specific procedural and substantive standards contained in the former § 2254(d). But I do not read it to dispense with a federal court's rudimentary responsibility to ensure that it is deciding a constitutional claim based on factual findings that were forged in a procedurally adequate way and were anchored in a sufficient evidentiary record. In this sense, § 2254(e)(1) departs from prior law, but only to substitute general notions of procedural regularity and substantive accuracy for detailed statutory standards.

Larry W. Yackle, *Federal Evidentiary Hearings Under the New Habeas Corpus Statute*, 6 B.U. PUB. INT. L.J. 135, 140–41 (1996)). We agree with this view. We have already held that "the extent to which a state court afforded a defendant adequate procedural means to develop a factual record . . . might be a consideration while applying deference under . . . § 2254(e)(1)." *Lambert*, 387 F.3d at 239. Today we hold that when a state court's waiver colloquy fails to reveal whether the requirements of a valid waiver have been met due to procedural infirmities, substantive deficiencies, and an insufficient probing into a defendant's knowledge of the rights he is waiving, the findings by that court concerning the waiver are too unreliable to be considered "factual determinations." They are not, therefore,

entitled to the presumption of correctness.[15]

---

[15] The question of when the presumption of correctness applies is not an entirely new issue. The First Circuit recently acknowledged as much, noting that

> [t]here is some disagreement about whether the presumption of correctness always applies or if there are instead certain procedural prerequisites. *See, e.g.*, *Mayes v. Gibson*, 210 F.3d 1284, 1289 (10th Cir. 2000) (if there was no "full, fair, and adequate hearing in the state court," the presumption of correctness does not apply); *cf. Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("If . . . a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts [under § 2254(d)(2) ].");  1 Hertz & Liebman § 20.2c (§ 2254(d)(2)'s reasonableness standard applies to both the process and the substance of state court factfindings).

*Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007).  The First Circuit went on to agree with this Court's decision in *Lambert*.  *Id.* ("The Third Circuit has taken the position that 'the extent to which a state court provides a 'full and fair hearing' is no longer a threshold requirement before deference applies; but it might be a consideration while applying deference under § 2254(d)(2)

While it is not difficult to discern the "factual determinations" made by Judge Sabo, we find the circumstances surrounding these determinations problematic. Fahy's waiver of his collateral and appellate rights resulted from a colloquy that was procedurally infirm. Judge Sabo did not allow Fahy's counsel to develop a factual record and the manner in which he conducted the proceedings constructively denied Fahy the assistance of his counsel.[16] Importantly, Judge Sabo refused to

---

and § 2254(e)(1).' *Blackwell*, 387 F.3d at 239. We agree with this approach. While it might seem questionable to presume the correctness of material facts not derived from a full and fair hearing in state court, the veracity of those facts can be tested through an evidentiary hearing before the district court where appropriate."). However, we do not believe that state court "findings" should automatically receive deference simply because of the ability to hold an evidentiary hearing later. Indeed, this would only provide an incentive for state courts to bypass usual judicial procedures designed to ensure accuracy for the sake of convenience, expediency or otherwise. We alluded to this in our *Lambert* opinion. While we explicitly declined to address how deeply a federal habeas court "may plumb the adequacy of state court jurisdiction and procedures in deciding how to apply section 2254(d) and (e)(2)," we did so because we concluded that there were no procedural issues involved that would lower the level of deference we must afford. *Lambert*, 387 F.3d at 239. Such is not the case in the current appeal.

[16] Judge Sabo also subjected Fahy's attorneys to verbal abuse at various points in the hearing. For example, when responding

allow Fahy's counsel to ask questions of Fahy about his own waiver, his own request in his letter to the court. As the exchange below demonstrates, Judge Sabo refused to allow Fahy to explain why the conditions of his incarceration were coercive and were prompting his request to waive all appellate and collateral proceedings.[17]

> COUNSEL FOR FAHY: "Explain the conditions of your incarceration right now?"

> COUNSEL FOR GOVERNMENT: "It is objected to, Your Honor."

> THE COURT: "Come on, Counselor."

> COUNSEL FOR FAHY: "For the record, Your Honor, Mr. Fahy—"

> THE COURT: "That is not the purpose of what he is down here for. Now cut this out. If you want to argue that[,] argue it to the Supreme Court.

---

to counsel's request to make a mental health proffer, Judge Sabo declared, "[Fahy] has more brains than you have" and "I told you he has more brains than all of you together."

[17] However, Judge Sabo tacitly acknowledged that the prison conditions may have been affecting Fahy by giving him a week in a different prison while he considered his request to waive.

26

. . .

COUNSEL FOR FAHY: "Your Honor, I have a list of other questions I am going to ask him. Are you denying me the right to do that?"

THE COURT: "Yes, I am."

COUNSEL FOR FAHY: "All right. May I make a proffer of those questions?"

THE COURT: "Well, what?"

COUNSEL FOR FAHY: "I want to talk about the conditions of his incarceration, Your Honor."

THE COURT: "What's that got to do with this? The Supreme Court didn't send him down here for me to find out what the conditions are."

COUNSEL FOR FAHY: "The conditions of his incarceration are what is causing him to make this decision."

THE COURT: "Maybe it is, I don't know, but he is making the decision on his own."

COUNSEL FOR FAHY: "I think if you would allow me to ask the questions that he would answer that the conditions of his incarceration cause him—"

27

COUNSEL FOR GOVERNMENT: "I would object to that."

. . .

COUNSEL FOR FAHY: "And if I may, your Honor: As to that purpose, the conditions . . ."

THE COURT: "Counselor."

COUNSEL FOR FAHY: "Two sentences, Judge, so you could listen to me for just a moment."

THE COURT: "I don't want to remove you from the case. I don't know why I let you in."

. . .

COUNSEL FOR FAHY: "All we are asking is a chance to either ask Mr. Fahy the question or make a proffer."

THE COURT: "Okay, you made the proffer. I am not concerned about the conditions at Greene."

COUNSEL FOR FAHY: "But the conditions in Greene are causing psychological hardship and have created this problem."

THE COURT: "Argue that to the Supreme Court and if the Supreme Court wants me to go into these psychological things, fine. But they didn't send it down

28

for that purpose."

COUNSEL FOR FAHY: "But, Your Honor – "

THE COURT: "For one purpose only they sent it down and that is all I am interested in."

COUNSEL FOR FAHY: "All I am saying, Your Honor, if the conditions of incarceration cause psychological problems, Your Honor should hear about it."

THE COURT" "Look, I know what Greene County is like. It is a recently-built institution, State institution."

COUNSEL FOR FAHY: "Mr. Natali asked Mr. Fahy the conditions of his incarceration. He fell apart and started crying on the stand. It is causing psychological hardship."

. . .

COUNSEL FOR FAHY: "And, Your Honor, just so we are clear: We ask for permission to either ask the questions or make a proffer."

THE COURT: "And I said you will take it up with the Supreme Court."

. . .

COUNSEL FOR FAHY: "Okay. And just so it is clear:

Your Honor is denying both of those requests; is that correct?"

THE COURT: "I am denying anything."

In analyzing a defendant's waiver of constitutional rights, the United States Supreme Court has said that the purpose of the "'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision *and whether the decision is uncoerced*." *Godinez*, 509 U.S. at 401 n.12 (second emphasis added). Here, we are loathe to accord a presumption of correctness to a determination of voluntariness where the judge explicitly refused to consider any evidence of coercion.

In addition, the colloquy failed to adequately probe into Fahy's knowledge of the rights that Judge Sabo asserted he was waiving. This omission is especially egregious given that Fahy told the court he had not spoken about federal appeals with his attorneys and Judge Sabo blatantly disregarded his counsel's objections to the questioning.

THE COURT: "Are you telling me that you wish to withdraw your appeal to the Pennsylvania Supreme Court and to the Federal Courts?"

FAHY: "Yes, I am."

COUNSEL FOR FAHY: "There is no Federal Court

30

proceeding, Your Honor."

THE COURT: "Well, he could have that opportunity, Counselor."

COUNSEL FOR FAHY: "Well."

THE COURT: "And that's what he is giving up."

COUNSEL FOR FAHY: "Well, I would object to that."

THE COURT: "I don't care if you object."

COUNSEL FOR FAHY: "May I state—"

THE COURT: "You are not here to cross-examine or anything. This is between Mr. Fahy and myself, who was sent down for me to decide."

COUNSEL FOR FAHY: "Yes, to—"

THE COURT: "To let him know what he is giving up. He knows he is giving up his rights in both the State Courts and the Federal Courts. And that the net result will be that he would be executed. He knows that."

COUNSEL FOR FAHY: "All I am asking for, Your Honor, is permission to state my objection."

THE COURT: "To say what?"

COUNSEL FOR FAHY: "To state my objection, the grounds for the objection."

THE COURT: "I don't care what your objections are. . . ."

COUNSEL FOR FAHY: "The only thing I am requesting, Your Honor, is permission to state my objection. If Your Honor thinks—"

THE COURT: "Well, you could state it to the Supreme Court if you wish."

. . .

COUNSEL FOR GOVERNMENT: "And by waiving your right to further appeals [do you understand] all those Courts I told you about will not review your case?"

FAHY: "Yes, I am aware of it."

COUNSEL FOR GOVERNMENT: "And you have discussed this case and all of these issues with all the attorneys that represent you?"

FAHY: "No, I have not."

COUNSEL: "You have discussed it with, you have discussed the issues with some of your attorneys?"

FAHY: "No, I have not. I am aware of it my own self. I

mean they have, we have spoken simply about this period of time we are in, we haven't spoken about Federal Courts and so on and so on and other appeals. We have simply spoken about this recent area we are in, this first stage."

Based on this inadequate colloquy, we are not prepared to say that Fahy knowingly waived his federal habeas rights. Indeed, in the context of, for example, the waiver of *Miranda* rights, the Supreme Court has required that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). While the colloquy does reveal that Fahy may have understood that the decision to waive his federal habeas rights could ultimately lead to his execution, it does not reveal that he had any knowledge whatsoever of the purpose of federal habeas corpus or its procedures. In a capital case, where the consequences are so grave, we are particularly wary of accepting a waiver of federal habeas rights when we are not convinced that the defendant was aware of the nature and scope of those rights.

Fahy's equivocation as to whether to waive all appellate and collateral proceedings further compels our conclusion that the waiver was neither knowing nor voluntary. On December 5, 1995, Fahy filed a handwritten pro se motion to the PCRA court requesting permission to waive all collateral proceedings and to withdraw his appeal that was currently pending before the

33

Pennsylvania Supreme Court. On July 17, 1996, the Pennsylvania Supreme Court remanded "for a colloquy to determine whether petitioner fully understands the consequences of his request to withdraw his appeal and to waive all collateral proceedings." Pursuant to this instruction, Fahy went before the PCRA court for a waiver colloquy on August 2, 1996. At that time, he stated that he desired an additional week to consider his request. During that week, Fahy signed a sworn affidavit stating that he no longer wished to waive his appellate rights, that he wanted to proceed with his appeal, and that he desired continued representation by counsel. However, two days after signing this affidavit, Fahy again appeared before the PCRA court and stated that he had again changed his mind and desired once more to waive his appeals. It was at this time that the waiver colloquy was hastily and peremptorily conducted and that Judge Sabo determined that Fahy had validly waived his rights.

We are in full agreement with the Commonwealth that if a defendant who has participated in a waiver proceeding is then allowed, without exception, to change his mind whenever he chooses, the doctrine of waiver will be rendered purposeless. Moreover, such an indulgence would be bad judicial policy resulting in frequent hearings and the expenditure of untold judicial resources. It is the rule in this Circuit that we will not "review the merits of [a defendant's] appeal if we conclude that she knowingly and voluntarily waived her right to appeal unless the result would work a miscarriage of justice." *United States v. Shedrick*, 493 F.3d 292, 297 (3d Cir. 2007) (citations

34

omitted).  Accordingly, if we were to conclude that Fahy knowingly and voluntarily waived his right to appeal to this Court, we would not allow him to change his mind unless the result would work a miscarriage of justice.  Here, however, we have concluded that Fahy's purported waiver was not knowing and voluntary.  What we have before us is a record of equivocation.  It does not support an enforceable waiver, which would deny Fahy federal review of his claims, including his sentence to death.  *See United States v. Khattak*, 273 F.3d 557, 563 (3d Cir. 2001) (endorsing consideration of multiple factors in deciding whether to relieve the defendant of an otherwise valid waiver, including "the impact of the error on the defendant").

Thus, we conclude that Fahy's state court waiver was invalid and is not a procedural obstacle to the exercise of our jurisdiction over his habeas petition.

## B. Procedural Default

The Commonwealth also argues that we are precluded from reviewing the merits of Fahy's habeas petition because his claims are procedurally defaulted.  We reject this argument.

The doctrine of procedural default prohibits federal courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is independent of the federal question and adequate to

support the judgment. *Nara v. Frank*, 488 F.3d 187, 199 (3d Cir. 2007) (citations omitted). Procedural default occurs when "a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). For a federal habeas claim to be barred by procedural default, however, the state rule must have been announced prior to its application in the petitioner's case and must have been "firmly established and regularly followed." *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991). This Court has declared why this requirement is important:

> First, the test ensures that federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule. As we said in *Cabrera v. Barbo*, "a petitioner should be on notice of how to present his claims in the state courts if his failure to present them is to bar him from advancing them in a federal court."
>
> Second, the firmly established and regularly followed test prevents discrimination. Novelty in procedural requirements can be used as a means of defeating claims that are disfavored on the merits. If inconsistently applied procedural rules sufficed as "adequate" grounds of decision, they could provide a convenient pretext for state courts to scuttle federal claims without federal review. The requirement of regular application ensures that review is foreclosed by what may

36

honestly be called "rules"—directions of general applicability—rather than by whim or prejudice against a claim or claimant.

*Bronshtein v. Horn*, 404 F.3d 700, 707–08 (3d Cir. 2005) (internal citations omitted). Consequently, whether the rule was firmly established and regularly followed is determined as of the date the default occurred, not the date the state court relied on it, because a petitioner is entitled to notice of how to present a claim in state court. *Taylor*, 504 F.3d at 428 (internal citations omitted).

As the District Court succinctly summarized, the Commonwealth's argument is that all of the claims asserted in Fahy's PCRA #3 are procedurally defaulted because they were raised and waived (and never exhausted),[18] and those in PCRA

---

[18] A federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002) (quoting *Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth*

#4 were raised out of time under the PCRA. Essentially, the Commonwealth argues that default by waiver and the PCRA time-bar are adequate state grounds to prohibit federal habeas review. We disagree and adopt the District Court's conclusion that neither default by waiver nor the PCRA time-bar was firmly established or regularly followed rules as of the date Fahy's default occurred. They cannot, therefore, be considered "adequate" state procedural rules barring consideration of Fahy's claims.

First, the Commonwealth argues that Fahy waived the claims raised in PCRA #3 when he withdrew his appeal to the Pennsylvania Supreme Court. We have already concluded that the waiver was not effective and does not bar our review of his claims. Even if this were not the case, at the time of Fahy's August 1996 waiver, the Supreme Court of Pennsylvania applied the relaxed waiver doctrine to reach the merits of claims brought by capital defendants that would otherwise be barred by waiver. This rule was in recognition of the fact that the "imposition of the death penalty is irrevocable in its finality." *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 942 n.3 (Pa.

---

*v. Serrano*, 454 U.S. 1, 3 (1981)). However, even if a state court refuses to consider the claim on procedural grounds, it is still exhausted as long as the state court had the opportunity to address it. *Nara v. Frank*, 488 F.3d 187, 198 (3d Cir. 2007) (citing *Bond v. Fulcomer*, 864 F.2d 306, 309 (3d Cir. 1989)).

1982).   Although the Pennsylvania Supreme Court later abrogated the doctrine of relaxed waiver, *see Commonwealth v. Albrecht*, 720 A.2d 693 (Pa. 1998) (explicitly abandoning the practice of relaxed waiver in PCRA appeals), at the time of Fahy's purported waiver the Court's practice was to address all issues arising in a death penalty case even if the issue had been waived.   Thus, in 1996, default by waiver was not a rule that was firmly established and regularly followed.   It cannot be a ground for procedural default.

Fahy's counsel filed PCRA #4 in November of 1997. The state court dismissed this petition as untimely pursuant to Pennsylvania's one-year PCRA statute of limitations, 42 Pa. Cons.Stat. Ann. § 9545(b)(1).[19]   Thus, the Commonwealth argues that Fahy's claims raised in PCRA #4 are procedurally defaulted because they are time-barred.

This Court has held that § 9545(b)(1) was not firmly established or regularly applied until November 23, 1998, at the earliest, when the Supreme Court of Pennsylvania decided *Albrecht*, 720 A.2d 693.   *See Bronshtein*, 404 F.3d at 708–09 (recognizing that petitioner, whose second PCRA petition was untimely under § 9545(b)(1), had not defaulted federal review because Pennsylvania previously applied a "relaxed waiver"

---

[19]   The District Court was correct in concluding that Fahy's default occurred in August of 1996, when Fahy's time to file a fourth petition expired.

rule, under which a claim of constitutional error in a capital case would not be waived by a failure to preserve it). Thus, the District Court was correct in determining that Fahy's claims raised for the first time in PCRA #4 are not barred by procedural default. *See Taylor*, 504 F.3d at 428.

Because there are no procedural barriers to our exercise of jurisdiction, we proceed to the merits of Fahy's habeas petition.

IV.

There are six claims presented to this Court for review. Our standard of review over each claim varies depending on how that claim was disposed of in the Pennsylvania courts. Some of the claims were addressed on direct appeal in the state system, some were "adjudicated on the merits" by Judge Sabo following Fahy's third PCRA petition, and others were raised for the first time in Fahy's fourth PCRA petition that was time-barred.[20]

---

[20] When according deference under AEDPA, federal courts are to review a state court's determinations on the merits only to ascertain whether the state court reached a decision that was "contrary to" or involved an "unreasonable application" of clearly established Supreme Court law, or if a decision was based on an "unreasonable determination" of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). We have

40

articulated the appropriate analysis as follows:

> A state court decision is contrary to Supreme Court precedent under § 2254(d)(1), if the state court reached a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.
>
> The state court's decision is an unreasonable application of clearly established law, under § 2254(d)(1) if the state court: (1) unreasonably applies the correct Supreme Court precedent to the facts of a case; or (2) unreasonably extends or refuses to extend that precedent to a new context where it should (or should not) apply. The unreasonable application test is an objective one—a federal court may not grant *habeas* relief merely because it concludes that the state court applied federal law erroneously or incorrectly.
>
> We have previously held that our analysis under § 2254 is a two step process. First, we identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim. If [we determine] that the state court decision was not 'contrary to' the applicable body of Supreme Court law—either because the state court decision complies with the Supreme Court

41

*A. Failure to Preserve Voir Dire Transcripts as Violative of Due Process*

Fahy argues that the failure to prepare and/or preserve the transcripts of his voir dire proceedings violated his rights to due process and a meaningful appeal because he was not afforded a fair and meaningful opportunity to raise jury selection errors. He raised this claim in PCRA #4, which was dismissed as untimely. Because the PCRA court never reached the merits of this claim, our review is de novo.

> rule governing the claim, or because no such rule has been established—then [we] should undertake the second step of analyzing whether the decision was based on an 'unreasonable application of' Supreme Court precedent.

*Shelton v. Carroll*, 464 F.3d 423, 436–37 (3d Cir. 2006) (internal citations omitted).

The claims that come to us from Fahy's fourth PCRA petition, however, were time-barred and the PCRA court never reached the merits of those claims. When "the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not apply." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). "In such an instance, the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Id.*; *Taylor*, 504 F.3d at 429.

It is indisputably true that a criminal defendant has the right to an adequate review of his conviction, *i.e.*, a sufficiently complete record. *Mayer v. City of Chicago*, 404 U.S. 189, 198 (1971). However, as the District Court aptly pointed out, neither the Supreme Court, nor our Court, has held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief.[21] This Court has recognized a defendant's request for a complete transcript only when the defendant has shown a "colorable need" for the transcript. *Karabin v. Petsock*, 758 F.2d 966, 969 (3d Cir. 1985) (citing *Mayer*, 404 U.S. at 195). Specifically, "[a] criminal defendant must first show a 'colorable need' for a complete transcript before the state must meet its burden of

[21]  *See, e.g.*, *Scott v. Elo*, 302 F.3d 598 (6th Cir. 2002) (explaining that the Supreme Court decision in *Mayer v. City of Chicago*, 404 U.S. 189, 198 (1971), "does not stand for the proposition . . . that where a portion of a trial transcript is missing and unobtainable, and where a defendant makes a claim that could possibly implicate that portion of the transcript, a retrial is always necessary. Rather, . . . federal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice."); *Stirone v. United States*, 341 F.2d 253, 256 (3d Cir. 1965) (failure of stenographer to transcribe voir dire was harmless error where "[t]here is no accusation even in this late collateral suit that there was error of any kind in the voir dire examination itself or that the failure of the stenographer to record the voir dire resulted in substantial error.").

showing that something less will suffice." *Id.* Because Fahy has not shown a "colorable need" for the voir dire transcript, we will deny relief on this claim.

With the exception of a *Batson* claim,[22] Fahy alleges no other specific instance of wrongdoing arising out of the voir dire.[23] Tellingly, Fahy does not even submit an affidavit from trial counsel, Daniel H. Greene, alleging the possibility that error

---

[22] As set forth below, Fahy does not have standing to pursue a *Batson* claim. Accordingly, *Batson* does not provide Fahy with a "colorable need" for the voir dire transcript.

[23] Counsel admitted as much in oral argument before this Court:

THE COURT: "Isn't your adversary correct that our *Karabin* decision makes that pretty tough for you?"
COUNSEL FOR FAHY: *"Karabin* says show need. Show us why you need this transcript before—"
THE COURT: "That has to be more than 'because I might be able to find something,' right?"
COUNSEL FOR FAHY: "I wish it wasn't, but it is more than that."
THE COURT: "Yes, so what are you offering us?"
COUNSEL FOR FAHY: "Sure. And what we're offering you is a *Batson* claim, and the *Batson* claim that has something to it. . . ."

N.T. 69–70 ¶ 19–24, 1–9.

44

occurred during the voir dire.[24]  This Court in *Karabin* found the fact that the defendant had "not shown that trial counsel w[as] unavailable to appellate counsel when and if needed" relevant to the "colorable claim" inquiry.  *Karabin*, 758 F.2d at 969 (holding that Karabin had not shown a "colorable need" for the transcripts of opening and closing statements, and thereby rejecting his contention of a due process violation).

Simply stated, Fahy has not provided this Court with any concrete claims of error occurring during the jury selection process that would justify a reconstruction of the record of that voir dire proceeding almost twenty-five years later.

## *B.* Batson *Claim*

Fahy alleges that the prosecution used its peremptory strikes to challenge jurors in a racially discriminatory manner in violation of the Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79 (1986).  This claim was raised in PCRA #4 and is subject to de novo review.

In *Batson*, the Supreme Court held that a defendant could make out a prima facie case of racial discrimination in the prosecution's use of peremptory challenges by using proof

---

[24]  Fahy does submit an affidavit from Greene on another issue, thus indicating his ability to procure such a statement if it could be helpful.

adduced solely from his own case, as opposed to the systematic showing of exclusion required by *Swain v. Alabama*, 380 U.S. 202 (1965). *Batson* further held that if the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, the petitioner's conviction must be reversed. *Batson*, 476 U.S. at 100 (citing *Whitus v. Georgia*, 385 U.S. 545, 549–50 (1967); *Hernandez v. Texas*, 347 U.S. 475, 482 (1954); *Patton v. Mississippi*, 332 U.S. 463, 469 (1947)). Establishing a prima facie case explicitly required the defendant to "show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race*." *Batson*, 476 U.S. at 96 (internal citation omitted) (emphasis added).

In 1991, the Supreme Court decided *Powers v. Ohio* and held that a defendant's race is irrelevant to his standing to object to the prosecutor's racially discriminatory use of peremptory challenges. 499 U.S. 400 (1991).

There is no question that *Batson* would apply to Fahy's case—*Batson* was decided in April of 1986 and Fahy's case did not become final until January of 1987. However, Fahy is white and he is objecting to the exclusion of African-Americans from his jury. Because *Powers* was decided in 1991, we must decide whether we can apply it retroactively to Fahy's claim. The answer to this question lies in the resolution of whether *Powers* is a "new rule."

46

We will not apply a new rule to cases on collateral review unless it falls within one of the exceptions set forth in *Teague v. Lane*, 489 U.S. 288, 301 (1989).[25] Fahy does not argue that *Powers* falls within one of the two *Teague* exceptions; rather, he argues that the holding in *Powers* is not a new rule and thus, there is no barrier to it being applied to his case on collateral review.

In *Teague*, the Court explained that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. . . . [A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301. The Supreme Court has indicated that if the outcome is susceptible to debate among reasonable minds,

[25] The Court in *Teague* held that "implicit in the retroactivity approach we adopt today . . . is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review through one of the two exceptions we have articulated." 489 U.S. at 316. Thus, a new rule will be applied retroactively only in two instances: first, if the rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," and second, "if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty" that are "watershed rules of criminal procedure." *Id.* at 311 (internal quotations omitted).

47

a new rule has been announced. *See Butler v. McKellar*, 494 U.S. 407, 415 (1990). The Court reiterated this principle in *Williams v. Taylor* when it explained that a rule "is not dictated by precedent unless it would be 'apparent to *all reasonable jurists.*'" 529 U.S. 362, 409 (2000) (quoting *Lambrix v. Singletary*, 520 U.S. 518, 528 (1997)). The "new rule" principle, then, lends itself to validating reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions. *Id. Cf. United States v. Leon*, 468 U.S. 897, 918–19 (1984) (deciding not to apply the exclusionary rule when officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment, even if it was later determined that their actions did violate the Fourth Amendment).

Fahy argues that the rule in *Powers* is not a new rule because it was dictated by *Batson* and the Supreme Court's jurisprudence on third-party standing. He argues that, at the time his conviction became final, any state court not extending *Batson* to a white defendant challenging the exclusion of African-American jurors would have been "objectively unreasonabl[e]." *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). We reject this argument. *Batson* explicitly required, as part of the prima facie showing, that the defendant be of the same race as the excluded juror. Clearly then, it was not "objectively unreasonable" for a court prior to *Powers* to refuse to extend *Batson* to a white defendant challenging the exclusion of African-American jurors. Tellingly, four courts of

48

appeals—after *Batson* was decided but before *Powers*—required that the defendant and the excluded juror be of the same race in order to assert a *Batson* claim. *United States v. Rodriquez*, 866 F.2d 390, 392 (11th Cir. 1989); *United States v. Angiulo*, 847 F.2d 956, 984 (1st Cir. 1988); *United States v. Townsley*, 856 F.2d 1189, 1190 (8th Cir. 1988) (en banc); *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir. 1987).

We recognize that the *Powers* Court cited *Batson* to support its holding. Specifically, it noted that *Batson* was not limited to the harm caused to the defendant when members of his own race were excluded from the jury. *Powers*, 499 U.S. at 406 (citing *Batson*, 476 U.S. at 87–88). Rather, *Batson* "was designed 'to serve multiple ends,' only one of which was to protect individual defendants from discrimination in the selection of jurors. *Batson* recognized that a prosecutor's discriminatory use of peremptory challenges harms the excluded jurors and the community at large." *Id.* (citing *Batson*, 476 U.S. at 87–88) (internal citations omitted).

We do not dispute that *Batson* arguably presages *Powers*. However, even assuming that to be true, it does not follow that the rule in *Powers* was "dictated by" the rule in *Batson*, such that the outcome in *Powers* was not susceptible to debate among reasonable minds. Indeed, the dissent in *Powers* itself makes clear the extent to which just such a debate was taking place at the time.

49

The *Powers* dissent characterized the majority's opinion as a "clear departure" from "prior law." *Id.* at 423. Two Justices dissented from the *Powers* decision because they believed that *Batson* challenges should proceed only when there is racial identity between the defendant and the excluded jurors. *Id.* at 422 (Scalia, J., dissenting, joined by Rehnquist, C.J.) ("[B]oth before and after *Batson*, and right down to the release of today's opinion, our jurisprudence contained neither a case holding, nor even a dictum suggesting, that a defendant could raise an equal-protection challenge based upon the exclusion of a juror of another race; and our opinions contained a vast body of clear statement to the contrary."). Additionally, after *Powers*, five courts of appeals addressed whether *Powers* applies retroactively and each has held that it does not. *Echlin v. LeCureux*, 995 F.2d 1344 (6th Cir. 1993) ("We agree . . . that *Powers* announced a new rule insofar as it extended *Batson* to cover challenges by a white defendant to the prosecutor's exclusion of black jurors."); *Holland v. McGinnis*, 963 F.2d 1044 (7th Cir. 1992); *Jones v. Gomez*, 66 F.3d 199 (9th Cir. 1995); *Nguyen v. Reynolds*, 131 F.3d 1340 (10th Cir. 1997); *Farrell v. Davis*, 3 F.3d 370 (11th Cir. 1993).

Accordingly, we are persuaded that *Batson* did not dictate the result in *Powers.* Therefore, Fahy's *Batson* claim fails because *Powers* was a new rule decided after judgment was final in his case.

### C.  Confession Claim

50

Fahy alleges that his confession was involuntary and the product of an unconstitutional waiver. Accordingly, he contends that its admission at trial violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.[26] Fahy further argues that trial counsel was ineffective for failing to properly present evidence of his mental health problems to the suppression court to show the involuntary nature of his confession.

## 1. Involuntary Confession

Fahy raised the issue of the voluntariness of his confession on direct appeal from his conviction and capital sentence.[27] The suppression court found, and the Pennsylvania Supreme Court affirmed, that the evidence supported the finding that Fahy's confession had been voluntary and that Fahy had knowingly and intelligently waived his *Miranda* rights. *Fahy 1*, 512 A.2d at 696 ("Our review of the conflicting testimony illustrates that Appellant, in fact, was informed of the charges

---

[26] Specifically, Fahy alleges that the confession was obtained by exploiting his mental, emotional and physical impairments, and his dependence on large doses of anticonvulsant medication to control his epilepsy.

[27] "Claims that state courts have incorrectly decided *Miranda* issues . . . are appropriately considered in federal habeas review." *Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

against him, advised of the nature of the questioning, and cognizant of his constitutional rights."). Because this claim was adjudicated on the merits in state court, it is entitled to deference under AEDPA.[28] In order for Fahy to succeed on the merits of his confession claim, he must demonstrate, and this Court must accept, that the state court's determination was "contrary to" clearly established federal law or reflected "an unreasonable application of" that law. 28 U.S.C. § 2254(d). In doing so, the appropriate focus of habeas corpus review is the suppression hearing conducted in the state trial court and the findings of fact made by the court before denying the motion to suppress. *Schmidt v. Hewitt*, 573 F.2d 794, 798 (3d Cir. 1978).

Our first task is to identify the relevant federal law, as determined by the Supreme Court. For purposes of § 2254(d)(1), clearly established law "refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). We must identify "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).

*Miranda* itself held that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently."

---

[28] *See supra notes* 9 & 14.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). The ultimate question in the voluntariness calculus is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985).

Consistent with *Schmidt*'s instruction, we look to the suppression hearing and that court's findings of fact to determine whether the Pennsylvania Supreme Court's adjudication of the confession claim was "contrary to" this

applicable federal law or reflected "an unreasonable application of" the law.

After reviewing the transcript of the suppression hearing and that court's findings of fact,[29] we are satisfied that they are accurately reflected in the Pennsylvania Supreme Court's analysis of the confession claim. The Pennsylvania Supreme Court's discussion of the confession is as follows:

---

[29] The suppression court found that Fahy arrived voluntarily to be interviewed, that he was advised that there were two warrants for his arrest on rape charges and that he was taken into custody at 10:15 p.m. It found that he was advised of his rights and that he waived his right to remain silent and his right to have an attorney present, and that the waiver was recorded in his own hand. The suppression court found that he orally confessed to the killing, signed the confession statement, and that the confession was not the product of threats or coercion. Further, the suppression court found that Fahy was lucid and did not claim to be under the influence of drugs.

In its conclusions of law, the suppression court recognized that "the ultimate test for voluntariness is whether the confession is the product of an essentially free and unconstrained choice by its maker." *Commonwealth v. Alston*, 317 A.2d 241, 243 (Pa. 1974). In determining that Fahy's confession was voluntary, the court considered the duration of the interrogation; the allowance of time for rest; food and use of toilet facilities; and the lack of physical coercion and threats.

54

When faced with conflicting testimony, a suppression court, as factfinder, may pass upon credibility, and these findings will not be disturbed when supported by the record. *Commonwealth v. Guest*, 500 Pa. 393, 456 A.2d 1345 (1983); *Commonwealth v. Firth*, 479 Pa. 333, 388 A.2d 683 (1978). The record reveals and the suppression court found that the evidence introduced by the prosecution was more credible than that of Appellant, and, therefore, the court refused to grant the motion to suppress.

At the suppression hearing, Detectives Chitwood and Rosenstein testified to the events surrounding the arrest and subsequent confession. Their testimony established that Appellant voluntarily appeared at the Philadelphia Police Sex Crimes Unit and was taken to the Police Administration Building for questioning regarding two warrants for rape. Detective Chitwood proceeded to inform Appellant that he was the prime suspect in the rape and murder of Nicky Caserta. The detective advised Appellant of his constitutional rights by placing a standard police form containing the *Miranda* rights in front of him and at the same time reading the warnings to him aloud. Appellant indicated his decision to waive his rights by initialing a standard police form containing both the warnings and questions regarding his understanding of his rights. At first, Appellant

denied his involvement in the Caserta killing. However, after being shown pictures of the victim's body, Appellant exclaimed, "I did it, I did it." Appellant then confessed to the crimes, giving a detailed description of how he raped and killed young Nicky Caserta. Appellant also gave the exact location of where he disposed of the murder weapon and later guided the police officers to the sewer where the knife was hidden.

After reading the statement, Appellant affixed his signature to each individual page of the ten page document. Detective Chitwood testified that during the interview and confession Appellant was alert and responsive. Throughout the questioning, Appellant was neither threatened nor coerced by the police, and denied being under the influence of drugs. The complete interview lasted approximately one and one-half hours.

Appellant's testimony at the suppression hearing was totally contradicted by the testimony of the Commonwealth's witnesses. Appellant claimed his confession was not voluntarily obtained. Appellant also claims his confession was not properly extracted, in that during the police questioning he experienced fatigue and the effects of his seizure and depression medication. We stated in *Commonwealth v. Jones*, 457 Pa. 423, 432–33, 322 A.2d 119, 125 (1974), "Intoxication

is a factor to be considered, but it is not sufficient, in and of itself to render a confession involuntary." "The test is whether there was sufficient mental capacity for the defendant to know what he was saying and to have voluntarily intended to say it." *Commonwealth v. Culberson*, 467 Pa. 424, 428, 358 A.2d 416, 417 (1976). *See also*[] *Commonwealth v. Manning*, 495 Pa. 652, 435 A.2d 1207 (1981); *Commonwealth v. Smith*, 447 Pa. 457, 291 A.2d 103 (1972).

The duty of the suppression court is to determine whether the Commonwealth has established by a preponderance of the evidence that the confession was voluntary and that the waiver of constitutional rights was knowing and intelligent. *Jones*, *Id.* Our responsibility on review is to determine whether the record supports the factual findings of the trial court and to determine the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975). Reviewing Appellant's arguments in light of the previously espoused standard, we are convinced the suppression court was correct in ruling that Appellant's statements were admissible. Our review of the conflicting testimony illustrates that Appellant, in fact, was informed of the charges against him, advised of

the nature of the questioning, and cognizant of his constitutional rights.

*Fahy 1*, 516 A.2d at 309–11.

On direct appeal, as the District Court recognized, the Supreme Court of Pennsylvania did not cite to any United States Supreme Court precedent or use "totality of the circumstances" language in reviewing the merits of Fahy's confession claim. Instead, the Supreme Court of Pennsylvania appropriately relied on its own state court cases, which articulated the proper standard.[30]

---

[30] *See, e.g.*, *Commonwealth v. Jones*, 322 A.2d 119, 124 (Pa. 1974) ("The United States Supreme Court has made it clear that there is no simple litmus paper test for determining whether a confession is involuntary. Instead, courts must consider the totality of the circumstances surrounding the confession. The burden is on the Commonwealth to demonstrate that the accused's will was not overborne, either through physical or mental pressure and that the statement issued from free choice.") (citations omitted); *Commonwealth v. Kichline*, 361 A.2d 282, 290 (Pa. 1976) ("All attending circumstances surrounding the confession must be considered in this determination. These include: the duration and methods of the interrogation; the length of delay between arrest and arraignment; the conditions of detainment; the attitudes of the police toward defendant; defendant's physical and psychological state; and all other conditions present which may serve to drain one's power of resistance to suggestion or to undermine one's self-

Because the state court applied the correct rule, Fahy's entitlement to relief depends on whether application of that rule was contrary to established federal law or an unreasonable application of that law. Based on the principles already articulated, we conclude that the state court's decision complies with the Supreme Court's mandate to consider the totality of the circumstances and is therefore not "contrary to" the applicable body of Supreme Court law existing at the time. The decision was also not an "unreasonable application" of that precedent. The suppression court was entitled to make the credibility determination that it did in the face of conflicting testimony, and it applied the correct law to its findings of fact and came to a reasonable conclusion. On review, the Supreme Court of Pennsylvania applied the proper standard and was reasonable in affirming the suppression court's legal conclusions in light of the evidence presented and the applicable law.

## 2. Ineffective Assistance

---

determination."); *Commonwealth v. Goodwin*, 333 A.2d 892, 895 (Pa. 1975) ("Further, in determining the voluntariness of the waiver, all attending factors and circumstances must be considered and evaluated: [T]he duration, and the methods of interrogation; the conditions of detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination.").

Fahy argues that his trial counsel was ineffective for failing to investigate and present mental health evidence in support of the motion to suppress his confession. We infer that Fahy believes we should review this claim de novo, as he asserts there was no "adjudication on the merits" of this claim in state court. We disagree. Fahy first raised this claim in PCRA #3, and we agree with the District Court that there was an adjudication on the merits by the PCRA court in Judge Sabo's October 25, 1995, Findings of Fact and Conclusions of Law ("1995 Opinion").[31]

Fahy argues that the ineffective assistance claim presented in PCRA #4 and on review in this habeas petition is distinct from the claim presented in PCRA #3 and decided upon

_____

[31] In the 1995 Opinion, Judge Sabo concluded:

> Trial counsel was effective in litigating defendant's motion to suppress and could not have advanced his claim with expert psychiatric testimony . . . . Trial counsel did present evidence that defendant had mental problems, but the thrust of his motion was that the police tricked defendant into signing a blank form on which the police wrote the confession. Defendant's supposed mental problems had little, if anything, to do with the alleged ruse. Defendant's motion was incredible, with or without, expert testimony, and this Court properly rejected it.

by Judge Sabo. His actual claim, he alleges, is that effective counsel would have presented mental health evidence to support the contention that *his confession was not voluntary, knowing and intelligent.* This claim, he argues, is different from that which Judge Sabo decided—whether effective counsel would have presented mental health evidence to support the claim that *he was tricked into making the statement.*

In the context of Fahy's testimony at the suppression hearing, we are convinced that this is a distinction without a difference. Fahy testified that he never confessed to the murder of Nicky Caserta. His contention during the entirety of the suppression hearing was that at no point during the interrogation did he ever admit to having anything to do with her death. He testified that he never signed a confession and that he consistently denied all involvement to the detectives. We fail to see how mental health testimony during this hearing would have brought anything to bear on whether his confession was knowing, intelligent and voluntary. Fahy does not contend that he was psychologically coerced into giving a confession, or that the detectives intimidated or tricked him into giving a confession, or even that he was unable to understand and comprehend the situation due to mental health deficiencies;[32] rather, he testified that he made no confession at all.

---

[32] During the suppression hearing, Fahy admitted that he was "very aware of what was going on . . . [j]ust uncomfortable and wanted to get out of there."

Thus, we agree with the District Court that there was an "adjudication on the merits" in state court when Judge Sabo held that counsel was not ineffective for failing to present expert psychiatric testimony. Therefore, in order for Fahy to succeed on this claim, he must convince this Court that the state court's determination was "contrary to" clearly established federal law, or reflected an unreasonable application of that law. 28 U.S.C. § 2254(d).

In order to succeed on a claim of ineffective assistance, Fahy must show that the state court's decision is either contrary to, or involves an unreasonable application of, the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, to prevail, Fahy must show that his counsel failed to perform adequately[33] and that actual prejudice occurred as a result. *Strickland*, 466 U.S. at 693–94. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Alternatively, Fahy must show that the state court applied *Strickland* unreasonably to the facts of his case.

---

[33] "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 693–94.

62

As previously stated, Fahy testified at the suppression hearing and at trial that he did not give the police a detailed confession; he argued that he signed blank forms. At no point does he contend that he would have given the completely contradictory testimony of admitting to making the confession if trial counsel had investigated and raised issues of his mental health with respect to the voluntariness of the confession. Moreover, Fahy admitted at the suppression hearing that he was aware of what was occurring at the time he was questioned.

Even assuming that Fahy's counsel introduced mental health reports, we fail to see how the result would have been different. While Fahy points to conclusions from psychiatric reports before and after trial, he does not explain how the conclusions in those reports would make him more susceptible to coercion, much less bear on his denial of making any confession at all. Thus, trial counsel did not perform deficiently by failing to introduce such evidence. Further, given the facts, we can only conclude that the state court's finding—that trial counsel could not have advanced his claim with expert psychiatric testimony such that his failure to introduce such testimony did not constitute deficient performance—was reasonable.

Finally, we agree with the District Court that Fahy has not presented evidence of a reasonable probability that, despite the strength of the other evidence (including his admission at trial that he told the police, his mother, and his girlfriend that he

had killed Nicky Caserta), the exclusion of the confession would have altered the results of the trial.  *See Fahy v. Horn*, 2003 WL 22017231, \*46.  Fahy is not entitled to relief on this claim.

## D. Prosecutorial Misconduct

Fahy asserts four instances of prosecutorial misconduct which he contends were so prejudicial as to entitle him to relief from his conviction.  In evaluating such claims, we consider "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted).  The Supreme Court further instructs that, for due process to have been offended, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))).  *See also Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992) (holding that our review of a prosecutor's conduct in a state trial in a federal habeas proceeding is limited to determining whether the prosecution's conduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." (quoting *Greer*, 483 U.S. at 765)).  This determination requires us "to distinguish between ordinary trial error and that sort of egregious misconduct which amounts to a denial of constitutional due process."  *Ramseur*, 983 F.2d at 1239 (quoting *United States ex rel. Perry v. Mulligan*, 544 F.2d

674, 678 (3d Cir. 1976)). Because we are satisfied that the prosecutor's comments, considered both individually and cumulatively, did not amount to a denial of due process, we reject Fahy's claim of prosecutorial misconduct.

### 1. *The Prosecutor's Comment About Incest*

Fahy alleges that the prosecutor suggested in her closing argument that he had an incestuous relationship with Nicky Caserta. Fahy raised this claim as an ineffective assistance of counsel claim in PCRA #3 and it was rejected. The District Court was correct in concluding that the claim was "adjudicated on the merits" and entitled to § 2254(d) deference.

Fahy contends that his case had nothing to do with incest and that the prosecutor's comments were simply an attempt to inflame the passions of the jury. The PCRA court concluded that the prosecutor did not suggest that Fahy himself committed incest but was instead responding to the defense's argument that Fahy could not have raped and murdered the victim because he loved her. According to the PCRA court, trial counsel was not ineffective for failing to assert a baseless objection. We agree with the District Court's conclusion that this decision was not contrary to or an unreasonable application of United States Supreme Court precedent. Again, the PCRA court did not cite

to Supreme Court precedent; however, it appropriately relied on its own state court cases, which articulate the proper standard.[34]

A significant part of Fahy's defense strategy was to persuade the jury that he had a close, loving relationship with Nicky Caserta, and therefore, could not have killed her. In her closing argument, the prosecutor noted that the only witness

---

[34] *See, e.g., Commonwealth v. Green*, 581 A.2d 544, 561–62 (Pa. 1990) (citing with approbation observations made by Chief Justice Burger in *United States v. Young*, 470 U.S. 1, 10 (1985):

> [Our] standards reflect a consensus of the profession that the courts must not lose sight of the reality that [a] criminal trial does not unfold like a play with actors following a script. It should come as no surprise that in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused. Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statement or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

*Id.* (internal citations and quotations omitted)).

who testified to a close relationship between Fahy and his victim was Fahy himself.  The prosecutor argued that

> [n]ot one other person that took that stand, except the defendant, ever said that Nicky used to come over and kiss the defendant.  Was that part of their little scenario to have you believe that they were so close and loving?  And ladies and gentlemen, even if they were close, which the evidence would not indicate, it would simply indicate that she knew him because he was her aunt's boyfriend.  She saw him because he lived with [her] aunt when she went to visit [her young cousin].  But, ladies and gentlemen, you've heard of incest.  And incest occurs even when it's your natural child, unfortunately, in this society and other societies.  In this case, it's not a natural relationship, it was not a blood relationship.  So the fact that she knew the defendant is only one more little piece of the puzzle.

The prosecutor's argument was simply this: if sexual abuse can occur in a blood relationship, then *a fortiori*, it can occur in a non-blood relationship, albeit a "loving" one.  This argument was proper and logical when responding to the defense's argument that Fahy could not have raped and murdered Nicky Caserta because he loved her.  Therefore, such a comment did not render Fahy's trial fundamentally unfair, and the state court's decision that Fahy's right to due process had not been violated was not contrary to or an unreasonable application of

clearly established federal law.

## 2. *Prior Incarceration Comment*

The second allegation is that the prosecutor intentionally and improperly elicited testimony of a prior incarceration from Fahy. On direct appeal, the Supreme Court of Pennsylvania noted that Fahy's answer was unsolicited and promptly stricken. *Fahy 1*, 516 A.2d at 697. It further observed that the answer did not indicate that he was convicted of a crime or the nature of the crime, and the comment was not exploited later in the trial or during closing arguments. *Id.* Thus, the Court concluded that the "single, unintentional reference did not inflame the passions and prejudices of the jury to the extent that Appellant was denied a fair trial." *Id.* The District Court concluded that the state court's decision was not contrary to or an unreasonable application of Supreme Court precedent. We agree.

The questioning by the prosecutor proceeded as follows:

Q. Mr. Fahy[,] approximately how long did you live at 2063 East Rush Street?

A. For about two years.

Q. And how often did you during that two year period did you live there?

A. Very often.

Q. For approximately how many months in the year of

1980 did you live there?

A. Months?

Q. Yes. How many of the months in 1980 did you live there?

A. As far as I know, all of them.

Q. You were never living anywhere else besides 2063 in 1980?

A. Not that I can remember; no.

Q. In 1979, how many months did you live there?

A. '79

(There was a long extended pause.)

I'm not sure. I think I was-(Pause) I think I could have been locked up for-

Mr. Greene: Objection.

THE COURT: Strike from the record the witness' last answer to that question as not being responsive. Mr. Fahy, would you please answer specific questions? Don't volunteer, or go into-

THE WITNESS: I'm trying to, Your Honor.

THE COURT: The question was, how many months and you can tell us how many months. Now, you can't—

THE WITNESS: Well, I am— I believe that me and Cookie [Fahy's then-girlfriend] got in a few arguments and I was away from the house-oh, for maybe about a day or two, at my mother's or different places until Cookie cooled down. But, I don't believe I was ever away from the house in '79 for any month at all.

Fahy argues that "the prosecutor knew or should have known that probing repeatedly into Mr. Fahy's whereabouts at the time in question would likely lead to his prior incarceration being revealed. In fact, that was the manifest purpose of the line of questioning." The record fails to support this argument.

As the District Court pointed out, the question posed called for no more than a simple numerical answer. The prosecutor asked Fahy directly how many months during 1979 he lived across the street from Nicky Caserta. As for any wrongful purpose behind the question, the prosecutor clarified at side-bar that Fahy lied on direct examination when he said that he lived at the house across the street from the victim for two years, because for most of those years he was in and out of jail. It was permissible, therefore, for the prosecutor to ask a question designed to place the defendant's credibility in question, and to undermine his contention that he had a close relationship with his victim. This claim provides no basis for a finding of prosecutorial misconduct. And assuming, *arguendo*, that there was improper conduct on the part of the prosecutor, the Pennsylvania Supreme Court correctly identified that the

applicable test is ultimately whether that conduct denied the defendant a fair trial. *Fahy 1*, 516 A.2d at 697. That Court's conclusion that Fahy was not denied a fair trial is neither contrary to nor an unreasonable application of United States Supreme Court precedent.

### 3. *"Representative of Satan" Comment*

Fahy alleges that the prosecutor improperly referred to Fahy as a "representative of Satan." He raised this claim in PCRA #4, which was dismissed as untimely without a review of the merits. We review this claim de novo.

In his closing argument, *defense counsel* suggested to the jury that whoever killed Nicky Caserta was "some representative of Lucifer or Satan," a "reprobate" and a "profligate." In response, the prosecutor used defense counsel's own words to argue that the evidence demonstrated that Fahy committed the killing, and thus, Fahy was the "representative of Satan." Specifically, at the start of her closing argument, the prosecutor stated:

> And if there is a reprobate, profligate, and a representative of Satan who committed this act, the evidence in this case indicates that the representative of Satan in this case is seated right over there. (Indicating to the Defendant.) And, it is the defendant in this case because all of the evidence in this case so indicates.

71

Fahy argues that the prosecutor's response was "unmistakably a religious argument, which asserted that Mr. Fahy must be convicted and put to death because he was literally the devil." We disagree.

We do not condone the characterization of Fahy as demonic, nor consider it a proper form of argument. However, the objectionable content was invited by or was responsive to the closing summation of the defense. *See Wainwright*, 477 U.S. at 182. The Supreme Court in *United States v. Young* explained that the idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. 470 U.S. 1, 12 (1985). Specifically, the Supreme Court has instructed that

> [i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead . . . the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant.
> *Young*, 470 U.S. at 11–12 (citing *Lawn v. United States*, 355 U.S. 339 (1958)).

72

To put it another way, the fact that a prosecutor's comment was invited may have a mitigating effect on the impact that comment might otherwise have on the jury.

Here, it is not enough that the prosecutor's comments were inadvisable or even objectionable. *See id.* Rather, the appropriate standard of review for such a habeas claim is "the narrow one of due process" to determine whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974).

In light of defense counsel's closing comments, which first introduced the notion of Satan's criminal responsibility into the proceedings, we are confident that the jury could not have believed that the prosecutor was arguing that Fahy was literally the devil—only that the evidence indicated that he committed the murder, and thus was the "representative of Satan" that defense counsel had initially referred to. Thus, we reject Fahy's contention that this comment so tainted the trial that he was denied due process.

### 4. *Comments on Fahy's credibility*

Fahy argues that the prosecutor repeatedly expressed her personal opinion that Fahy had testified falsely. He raised this claim in PCRA #3 and it was rejected.[35] Despite this, the

---

[35] The PCRA court concluded that:

[Defense] counsel argued in closing that the

73

District Court concluded that there was no "adjudication on the

<hr>

defendant told the truth on the stand in denying his guilt and that the Commonwealth witnesses, particularly the police officers who recorded defendant's confession, had lied. The prosecutor could respond to trial counsel's argument about the credibility of his client, especially where she told the jury that she was not expressing her personal opinions, but was commenting on the evidence.

The PCRA court's opinion spent a page discussing the claim and indicated how it reached the decision:

The prosecutor did not commit misconduct in commenting on the credibility of the defendant. Pennsylvania courts have allowed prosecutors great leeway in presenting argument based on the evidence of record concerning the credibility of defense witnesses, especially where, as here, the defendant makes credibility an issue. . . . Here trial counsel argued in closing that defendant told the truth on the stand in denying his guilt and that the Commonwealth witnesses, particularly the police officers who recorded defendant's confession, had lied. The prosecutor could respond to trial counsel's argument about the credibility of his client, especially where she told the jury that she was not expressing her personal opinion.

merits" under *Chadwick v. Jenecka*, 312 F.3d 597 (3d Cir. 2002), and therefore, it is not entitled to deference. We disagree with the District Court and conclude that the state court decision is entitled to § 2254(d) deference. In *Chadwick*, this Court noted that "the Supreme Court clearly held that the § 2254(d) standards apply when a state supreme court rejects a claim without giving any indication of how it reached its decision." *Id.* (citing *Weeks v. Angelone*, 528 U.S. 225, 237 (2000) (affirming state supreme court's rejection of a claim without explanation, concluding that the adjudication was neither "contrary to," nor involved an "unreasonable application of," any of its decisions)).[36] At all events, we agree with the District Court with regard to the merits of the claim.

The first allegedly improper statement occurred while the prosecutor was cross-examining Fahy:

> Q: Didn't you just say that you were seeing her?
>
> A: I was seeing—I said I used to. I was seeing no one at the time. I was with Cookie. I went with Cookie for

---

[36] While we realize that the state supreme court never reached the merits of Fahy's third petition because of his waiver, we believe that deference still applies to the PCRA court's decision. *See* 28 U.S.C. § 2254(d) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to *the judgment of a State court* shall not be granted with respect to any claim that was adjudicated on the merits *in State court proceedings* unless the adjudication of the claim . . . .") (emphases added)).

75

good, so if you want to try to get a few things into my mind and get them twisted, you know, it's up to you.

Q: Why don't you just answer questions?

A: I'm trying to answer the question as best I can. You want me to tell you what you want.

Q: All I want from you, Mr. Fahy, is the truth, if you know what that is.

Defense counsel objected to this last statement and asked for a mistrial. The trial court denied the request but instructed the jury to disregard the remark. Defense counsel later objected to statements made during the prosecution's closing argument. The prosecutor, in discussing Fahy's testimony and credibility, stated:

[Defense counsel] said that there is a scenario that was presented. Well, from the evidence in this case, the scenario that was the defendant's version of what happened was a well-orchestrated scenario. Mr. Fahy would have you believe that he only talked to his lawyer about his testimony once or twice. Is that believeable? The way [defense counsel] prepared this case, that he only talked to his client once or twice?

Mr. Fahy took the stand and went through an entire day, minute by minute, practically. He told you exactly where he placed battery cables

and what he did. But, when it came to cross-examination, he couldn't remember the lies he told on direct examination. And all of a sudden, he gives a completely different answer from the morning to the afternoon session. He couldn't remember which lies he was supposed to tell.

Defense counsel objected to the use of the word "lies" and the trial court instructed the prosecutor to rephrase her statement. The prosecutor then pointed to a specific instance of Fahy's inconsistent testimony.

Fahy argues that the prosecutor's comments in the above instances were improper statements of her personal belief about his credibility and thereby prejudiced the jury. If a defendant testifies on his own behalf, as occurred here, a prosecutor may attack his credibility to the same extent as any other witness. *See Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900). This does not mean, however, that a prosecutor may express his personal belief in the credibility of a witness or the guilt of a defendant. *See, e.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935). When the claim is that a prosecutor's remark at trial so infected the trial with unfairness as to make the resulting conviction a denial of due process, we must examine the comment in light of the entire proceedings. *DeChristoforo*, 416 U.S. at 643. We do not think that the state court's decision here is an unreasonable application of this law. *See supra* note 35.

Here, the prosecutor explained to the jury at the beginning of her closing argument that she could not give her personal opinion of Fahy's guilt. She then proceeded during her

closing to point out the inconsistencies in Fahy's testimony. Her comments on Fahy's preparation for his testimony served as a suggestion that the jury consider the detailed nature of his testimony in contrast to his claims that he had discussed it only "once or twice" with his counsel. The record supports this argument, in that Fahy's testimony regarding his whereabouts on the day of the murder was given in considerable detail. While the prosecutor's conclusory use of the word "lies" was unfortunate, it did not infect the proceedings with unfairness.

Fahy attempts to argue that while the record supported the assertion that he made inconsistent statements, it did not support an inference that both statements were lies. This is sophistry. Either Fahy signed his *Miranda* warnings or he did not; only one statement could be true.

Because the prosecutor made it clear that she was not expressing her personal opinion but was relying on the facts in the case, we do not believe that her use of the word "lies" or her comment about Fahy's credibility made the resulting conviction a denial of due process. Therefore, we reject Fahy's claim.

5. *Cumulative Effect of Prosecutorial Comments*

Fahy argues that cumulatively these comments had a substantial prejudicial effect on the defense. As noted above, the comments Fahy recites were either not improper, or if they were improper, not prejudicial. Taken together, their cumulative effect could not have deprived Fahy of a fair trial.

E. *All Prior Counsel Rendered Ineffective Assistance*

78

In catch-all fashion, Fahy asserts that, to the extent that prior trial and direct appeal counsel failed to properly investigate and failed to make certain objections at trial, as alleged throughout his brief, he was provided ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments. He raised this issue for the first time in PCRA #4, and we therefore review the claim de novo.

We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir. 1996) (citing *Strickland*, 466 U.S. at 689). That is to say, the "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Indulging this presumption after reviewing each of counsel's claims, we are satisfied that prior trial and direct appeal counsel (here, the same counsel in both instances) provided reasonable professional assistance. Even assuming error by counsel, Fahy has failed to show that any alleged deficient performance actually prejudiced his defense. *Berryman*, 100 F.3d at 1094. That would require a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *i.e.*, a trial the result of which is reliable. *Id*. Fahy has failed to convince us that he was deprived of a fair trial, and we deny this claim.

*F. Cumulative Effect of All Errors*

Fahy also argues that the cumulative effect of all of the errors at trial entitle him to relief. Individual errors that do not

79

entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. *Albrecht v. Horn*, 471 F.3d 435, 468 (3d Cir. 2006). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

We have already concluded that the admission of Fahy's confession was not error, and that at least two out of the four challenged prosecutorial remarks were proper comment. However, even if we were to combine all of the prosecutor's allegedly improper remarks with the admission of Fahy's detailed confession, there is still weighty evidence of Fahy's guilt in the record. The testimony of the Commonwealth's witnesses established that the person who killed Nicky Caserta entered the house between 7:15 a.m., when the child's mother left, and 7:30 a.m. when the child was supposed to meet a schoolmate. The door was locked, so it was unlikely the victim would have let anyone in the house whom she did not know. Fahy had told a coworker at 6:45 a.m. that he would pick him up in five minutes, but then arrived over an hour later looking pale. Fahy later took a bath and washed his long underwear. Fahy's girlfriend testified that he confessed to her, and Fahy himself testified that he confessed to the killing when speaking with his mother. The verdict was not, therefore, unreliable.

V. Conclusion

80

For the reasons stated, we will vacate the judgment of the District Court entered on August 26, 2003, to the extent that the writ was granted on the *Mills* issue. The matter will be remanded to the District Court. On remand, the District Court should apply *Teague* in conjunction with *Beard* and deny relief on the *Mills* claim. The District Court should consider whether trial and appellate counsel were ineffective for failing to object to and litigate the *Mills* violation. The Court should consider the remaining sentencing-phase issues, which it initially denied as moot. The Court's determination that the guilt phase issues do not warrant habeas relief will be affirmed.