**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-9002
_____

ROBERT WHARTON,
                                        Appellant

v.

DONALD T. VAUGHN
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2:01-cv-06049)
District Judge:  Honorable Mitchell S. Goldberg
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
January 4, 2018

Before:  VANASKIE, SHWARTZ, and GREENBERG, Circuit Judges

(Opinion filed January 11, 2018)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PER CURIAM

Pennsylvania prisoner Robert Wharton appeals from the District Court's denial of his capital habeas petition. The District Court granted a certificate of appealability ("COA") with respect to two of Wharton's guilt-phase claims, and we later expanded the COA to include one of his sentencing-phase claims. For the reasons that follow, we will affirm the District Court's order denying relief on the two guilt-phase claims, vacate its order denying Wharton's sentencing-phase claim, and remand for an evidentiary hearing on that surviving claim.

## I.     Background

In 1985, a jury in the Philadelphia County Court of Common Pleas found both Wharton and co-defendant Eric Mason guilty of two counts of first-degree murder and related offenses in connection with the deaths of Bradley and Ferne Hart.[1] The evidence at trial, viewed in the light most favorable to the Commonwealth, showed that the killings were the culmination of a series of crimes committed by Wharton and his cohorts against the Harts in retribution for Bradley's criticisms of, and refusal to pay for, construction work Wharton performed in the summer of 1983. In August 1983, Wharton and co-worker Larue Owens burglarized the Harts' home twice. During the second burglary, in which Mason also participated, the intruders extensively vandalized the Harts' home and left a note taunting Bradley's failed efforts to safeguard his family. The following month,

---

[1] For ease of identification, we will refer to the victims by their first names.

2

Wharton and Mason burglarized the church founded by Bradley's father, Dr. Samuel Hart, leaving a defaced photograph of Bradley pinned to the wall with a letter opener.

In January 1984, Wharton, Mason, and Thomas Nixon went to the Harts' home, armed and intending to rob them. However, the plan was abandoned that day when it was discovered that the Harts had a visitor in the house. Later that month, Wharton and Mason returned to the house when only the Harts and their seven-month-old daughter, Lisa, were present. When Bradley answered the door, Wharton pulled out a knife and told Bradley and Ferne to go sit on the couch. After Wharton and Mason entered the house, Wharton forced Bradley to write a check in the amount that Wharton believed he was owed. The adult Harts were then tied up and forced to sit on the couch while Wharton and Mason were "messing around" and watching television. (App. at 1820.)

The two intruders eventually decided to separate the couple. Bradley was taken to the basement, while Ferne was taken to the second floor. Lisa was left on a bed on the second floor. The adult Harts' faces were then covered with duct tape. Wharton took Ferne into the bathroom and bound her hands and feet with neckties. Wharton then strangled her with a necktie, filled the bathtub with water, and held her head under the water "until the bubbles stopped." (Id. at 1821.) Wharton left her body draped over the bathtub, with her pants pulled down and her shirt pulled up, exposing her breasts. As for Bradley, he "was forced to lie face down in a pan of water while one of the intruders stood with one foot on his back, as shown by a footprint on this victim's shirt, pulling on

3

an electrical cord tied around his neck." Commonwealth v. Wharton, 607 A.2d 710, 714 (Pa. 1992) [hereinafter Wharton I]. Wharton and Mason then turned off the heat in the house, locked the door, and left Lisa to fend for herself. The two men took with them various items from the house, including a camera and Bradley's coat.

Three days after the murders, Dr. Hart, concerned that he had not heard from Bradley or Ferne, went to the house. After forcing the door open, Dr. Hart heard Lisa's cries and found her upstairs, where she was suffering from dehydration and hypothermia. Dr. Hart also found the bodies of Bradley and Ferne. Lisa went into respiratory arrest on the way to the hospital; fortunately, she recovered and survived.

An investigation into the killings quickly led the police to suspect Wharton. Acting on a statement from the mother of Wharton's girlfriend, Tywana Wilson — Wilson's mother told police that Wharton had given Wilson a camera — the police executed a search warrant on Wilson's residence and found the Harts' camera and several other items stolen from them. Shortly thereafter, the police arrested Wharton. A search of his residence uncovered additional items stolen from the Harts during the January 1984 home invasion, as well as the knife that had been used to gain entry into their house. Wharton waived his Miranda rights and confessed to his involvement in the January 1984 home invasion and to killing Ferne.[2] Wharton named Mason as his accomplice and

---

[2] Wharton later confessed to participating in the two earlier burglaries of the Harts' home. Although Wharton never confessed to burglarizing the church, Larue Owens testified at trial that Wharton had admitted to his involvement in that burglary.

4

claimed that Bradley had been left downstairs with Mason, who put Bradley's head in a bucket of water.

The police arrested Mason on the same day as Wharton. A search of Mason's residence uncovered Bradley's coat and other items stolen from the Harts during the January 1984 home invasion. One of Mason's sneakers matched the imprint found on Bradley's shirt. After Mason's arrest, he waived his Miranda rights and confessed to participating in the January 1984 home invasion. His account was similar to Wharton's; the main difference was that Mason indicated that Wharton had killed Bradley (because Mason could not go through with it).

Before trial, Wharton moved to suppress his confession as involuntary and sever his trial from Mason's. The trial court denied those motions. At the joint trial, both defendants' confessions were admitted into evidence. The confessions were redacted so that the phrase "the other guy" replaced references to the co-defendant's name, and the trial court instructed the jury that each confession was to be considered against only the defendant who made it. One of the Commonwealth's many witnesses at trial was Nixon (who had been involved in the abandoned attempt to enter the Harts' home). Nixon testified that, after the murders, he called Wharton to ask if he (Wharton) and Mason were responsible for those crimes. Wharton answered in the negative, but Nixon then said, "[I]f [you] were going to kill the mother and the father, [you] should have killed the baby also." (App. at 2217.) Wharton replied, "We couldn't do it." (Id.)

5

Neither defendant testified at trial. Wharton's defense revolved around his claim that he had confessed involuntarily. The jury found both defendants guilty of two counts of first-degree murder and related offenses. At the penalty phase, the jury returned a verdict of death against Wharton and a verdict of life in prison against Mason.

In 1992, the Pennsylvania Supreme Court ("the PSC") affirmed Wharton's conviction but vacated his sentence and remanded for a new penalty hearing because of a defect in the penalty-phase jury charge. See Wharton I, 607 A.2d at 723-24. Later that year, a new penalty hearing was held. As before, the jury returned a verdict of death. Wharton once again appealed, but this time the PSC affirmed his sentence. See Commonwealth v. Wharton, 665 A.2d 458, 459 (Pa. 1995). After the United States Supreme Court ("the Supreme Court") denied certiorari, Wharton petitioned for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"). The PCRA court denied that petition without a hearing in 1997, and the PSC affirmed that denial in 2002. See Commonwealth v. Wharton, 811 A.2d 978, 981 (Pa. 2002) [hereinafter Wharton III].

Wharton then timely filed a counseled habeas petition in the District Court under 28 U.S.C. § 2254, raising numerous claims. In 2012, after holding an evidentiary hearing on two of those claims, the District Court issued a 157-page opinion and an accompanying order that denied habeas relief but granted a COA with respect to two guilt-phase claims: (1) Wharton's trial counsel, William T. Cannon, was ineffective at both the suppression hearing and at trial for failing to present certain evidence that would

6

have shown that Wharton's confession was made involuntarily; and (2) Wharton's rights under the Confrontation Clause were violated when (a) a prosecution witness testified at trial that Wharton had been implicated in Mason's confession, and (b) Mason's redacted confession was admitted at trial.

After the District Court denied Wharton's motion to alter or amend its denial of habeas relief, he filed this appeal and asked us to expand the COA to include more claims. We granted that request in part, expanding the COA to include one sentencing-phase claim: Cannon was ineffective for not investigating Wharton's adjustment to prison or presenting evidence of that adjustment at the second penalty hearing. The three claims covered by the COA are now ripe for disposition.[3]

## II. Wharton's Claim that Cannon was Ineffective at the Suppression Hearing and at Trial

We begin our analysis with Wharton's claim that Cannon was ineffective at both the suppression hearing and at trial for not presenting certain evidence to support the contention that Wharton's confession was made involuntarily. The PSC denied this claim as unreviewable because Wharton had not raised it in his PCRA petition. See Wharton III, 811 A.2d at 987. The District Court, after determining that the PSC had

---

[3] The District Court had jurisdiction over Wharton's habeas case pursuant to 28 U.S.C. § 2254, and we have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. See Robinson v. Beard, 762 F.3d 316, 323 (3d Cir. 2014). We exercise plenary review over the District Court's legal conclusions and review its factual findings for clear error. See Lambert v. Blackwell, 134 F.3d 506, 512 (3d Cir. 1998).

7

relied on an inadequate state law ground, reviewed the claim de novo. The District Court held an evidentiary hearing on this claim and ultimately denied the claim on its merits. Although the Commonwealth argues on appeal that aspects of this claim are procedurally barred for various reasons, we need not reach those issues. As explained below, even if we assume that every aspect of this claim that is discussed in Wharton's appellate briefing is properly before us, the claim fails on the merits.

## A.     Claim Background

To decide this claim, we must examine not only Wharton's confession, but also his arrest. At both the suppression hearing and at trial, the lead detective in the case, Charles Brown, gave detailed testimony about the circumstances of Wharton's arrest (at his home) and his subsequent confession (at the police station). The parties are well acquainted with that testimony, so we may briefly summarize it here. Brown testified that, to effectuate the arrest, he broke down the front door of Wharton's home and tackled Wharton because Wharton had been attempting to flee up the stairs. Before Wharton was taken to the police station, Brown noticed redness on Wharton's head in the form of a cut or bruise, but it was not an open wound and there was no bleeding. Brown testified that the injury may have occurred when he tackled Wharton. After Wharton arrived at the police station later that morning, he waived his Miranda rights and gave a detailed confession in question-and-answer format. When Brown's partner had finished typing

8

Wharton's answers, Wharton was given the opportunity to review them and make changes. Wharton then signed the confession.

At the end of the suppression hearing, Cannon conceded that Wharton's confession was "obtained in a voluntary manner." (App. at 998.) Despite this concession, Cannon challenged the confession's voluntariness at trial. After the Commonwealth rested its case, Cannon called Wharton's sister, Beverly Young, to dispute Brown's statement that Wharton had been tackled during the arrest.[4] Cannon also presented Wharton's medical records from the Philadelphia Detention Center ("PDC"), where Wharton had been transferred after he was arrested and confessed. These records, which were dated the same day as the arrest and confession, indicated that he had a "[s]mall laceration" on his scalp without "gaping" or bleeding, "[a]brasions" on the right side of his neck, and complaints of a headache. (Id. at 2431-32.)

On habeas review, Wharton alleges that Cannon should have presented a plethora of documentary and testimonial evidence at the suppression hearing and at trial to impeach Brown's testimony. Wharton contends that this evidence would have supported the conclusion that he had not been tackled during his arrest but instead had suffered the injury to his head (and the abrasions to his neck) while the police beat him into

---

[4] Immediately after Young testified, the trial court explained to the jury that, although a sequestration order was in place during the trial, Young had been in the courtroom during the first day of Brown's testimony. The trial court instructed the jury to "take that factor into consideration in evaluating [Young's] credibility." (App. at 2429.)

confessing. The District Court assumed for the sake of argument that Cannon's failure to present this evidence was objectively unreasonable, but it nevertheless concluded that this claim lacked merit because he could not show prejudice under Strickland v. Washington, 466 U.S. 668, 687 (1984). For the reasons that follow, we agree with that conclusion.

To prevail on this claim, Wharton must show that Cannon's performance fell below an objective standard of reasonableness, and that he (Wharton) suffered prejudice as a result of that performance. See id. at 687-88. Prejudice under Strickland is not established unless "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "[T]he difference between *Strickland*'s [reasonable probability] standard and a more-probable-than-not standard is slight and matters only in the rarest case." Harrington v. Richter, 562 U.S. 86, 112 (2011) (internal quotation marks omitted). To the extent that Wharton alleges that Cannon was ineffective at the suppression hearing, Strickland's prejudice analysis is a two-step process. That is, Wharton must prove that (1) his suppression claim is meritorious, *and* (2) "there is a reasonable probability that the verdict [at trial] would have been different absent the excludable evidence." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

### B. Cannon's Alleged Ineffectiveness at the Suppression Hearing

Wharton claims that Cannon should have called Young, Wilson, and Wharton's mother ("Mrs. Wharton") to refute Brown's suppression hearing testimony. These

10

proposed witnesses testified at the federal evidentiary hearing about Wharton's arrest (each of these witnesses was in the house when he was arrested), and Wilson's testimony also implied that Wharton had been mistreated at the police station.[5] The District Court carefully considered these witness testimonies and compared them with prior accounts given by these witnesses.[6] As discussed in the District Court's thorough and cogent opinion, each of these comparisons revealed material inconsistencies between the witness's evidentiary hearing testimony and her prior account. Additionally, as the District Court explained, Wilson's testimony about the events at the police station was materially inconsistent with "objective evidence of record." (App. at 61.)[7] These material inconsistencies, along with the witnesses' bias in favor of Wharton, significantly undermined their credibility. As a result, these flawed testimonies would have carried little, if any, impeachment value at the suppression hearing.

---

[5] Wilson testified that, when the police permitted her to visit with Wharton at the station, she noticed that his ears were purple, that he had "a scratch, ash kind of mark" on his neck, and that there were "smudges" or "dirt marks" on the thigh area of his pants. (See App. at 4274-76.)

[6] Young, of course, had testified at trial. As for Wilson and Mrs. Wharton, they had submitted written declarations in Wharton's PCRA case.

[7] That record evidence consisted of a "Chronology of Interrogation" prepared by the police and three photographs that the police took of Wharton after his interrogation. Two of the photographs are typical mug shots (in one shot he is facing forward; the other is a profile view), while the third photograph shows him from the knees up, facing forward. "[T]he area of [Wharton's] head [laceration] is not specifically depicted" in the photographs, but they "nevertheless show no signs of physical injury or trauma on his face and ears, or 'smudges' on his pants." (App. at 62.)

Wharton further claims that Cannon should have presented four police documents at the suppression hearing because none of them indicated that Wharton was injured during his arrest. Contrary to Wharton's assertion, presenting this evidence would have done little, if anything, to impeach Brown's hearing testimony. Two of the documents in question — Form 75-229 and a police "Activity Sheet" — did not specifically request information about whether Wharton was injured. Meanwhile, the other two documents — Form 75-49/52 and Form 75-48 — were not necessarily inconsistent with Brown's testimony.[8]

At a suppression hearing, the prosecution must prove, by a preponderance of the evidence, that the defendant confessed voluntarily. Commonwealth v. Nester, 709 A.2d 879, 882 (Pa. 1998). Given this relatively low standard, the limited impact of Wharton's

---

[8] Form 75-49/52 was a lengthy report that Brown prepared at some point after Wharton's arrest. Although the report briefly noted that Wharton "had no apparent injuries" at the time of his arrest, (App. at 5175), this notation is not surprising in light of Brown's testimony that the moment he noticed the cut/bruise on Wharton's head "was the last time [he] ever thought of it," (id. at 951). Form 75-48 was a one-page document completed by Officer Thomas Duffy, who was a member of the unit that transported Wharton to the police station after his arrest. One of the many boxes on this form is labeled "Nature of Injury," (id. at 5196); that box is blank. At the federal hearing, Duffy testified that if an arrestee was suffering from an "obvious" or "visible" injury, (id. at 4244), the policy in 1984 was to take the arrestee to the hospital (or otherwise have medical personnel attend to him) before taking him to the police station. But Duffy also testified that it had *not* been his practice to closely examine arrestees for injuries before taking them to the police station. We agree with the District Court that, "[g]iven the minimal nature of [Wharton's] injury and Duffy's testimony, the absence of an 'Injury' notation on the 75-48 Form is unsurprising and would [hold] little impeachment value [against Brown]." (Id. at 50-51.)

12

proffered evidence, and Brown's detailed hearing testimony, Wharton has failed to show that his motion to suppress would have been meritorious if Cannon had presented the proffered evidence. See Morrison, 477 U.S. at 375. Therefore, we will affirm the District Court's denial of Wharton's suppression hearing claim.

### C. Cannon's Alleged Ineffectiveness at Trial

Wharton alleges that Cannon was ineffective at trial for not impeaching Brown with the following: (1) the aforementioned police documents; (2) the testimonies of Wilson and Mrs. Wharton; (3) the suppression hearing testimonies of two other detectives regarding how the police entered Wharton's home to effectuate his arrest; (4) Brown's inconsistent testimony about whether Wharton was handcuffed when Brown entered the interrogation room; and (5) documentary evidence regarding a camera "data back," one of the many items stolen from the Harts. Wharton further alleges that Cannon should have interviewed Young before trial.

As indicated above, the four police documents and the testimonies of Wilson and Mrs. Wharton would have provided little, if any, impeachment value. The suppression hearing testimonies of the other two detectives also would have done little, if anything, to impeach Brown's testimony. Although Detective James Alexander initially testified at the hearing that Mrs. Wharton had opened the door for the police, he clarified that he had been along the side of the house when entry was made, that he had only assumed that Mrs. Wharton had opened the door, and that the other detectives had later informed him

13

that forced entry had been made. Detective Francis Ansel's hearing testimony, meanwhile, was hardly a definitive account,[9] and he testified at trial that he, too, had been along the side of the house when entry was made. Further limiting the impact of Alexander's and Ansel's hearing testimonies is the fact that Young and Mrs. Wharton — Wharton's own witnesses — agree with Brown that forced entry was made.

Wharton's prospects at trial would not have improved by highlighting Brown's inconsistent testimony about whether Wharton was handcuffed when Brown entered the interrogation room. Brown's hearing testimony was that Wharton was handcuffed at that time, while Brown's trial testimony stated the opposite. But this inconsistency is not material. Brown consistently testified that Wharton was not wearing handcuffs when Wharton's Miranda rights were administered or when he gave his confession, and there is no evidence that the possible presence of handcuffs when Wharton was first placed in the interrogation room affected the voluntariness of his confession.

Nor would Wharton have benefited from Cannon impeaching Brown about a camera "data back" (a camera attachment that imprints the date on the negative of a photograph), which was among the property stolen from the Harts. Brown testified at trial that this item was found in Wharton's bedroom, while a police form indicated that this item was recovered in Wilson's house. But this inconsistency is not significant.

---

[9] Ansel testified at the hearing that he "believe[d]" that Brown and another detective had been admitted into the house by "[s]omeone … possibly the mother of Mr. Wharton," (App. at 794); Ansel did not "recall" anyone having to break down the front door. (Id.)

14

Given that numerous items stolen from the Harts' home during the January 1984 home invasion were discovered in the homes of Wharton, Mason, and Wilson, the fact that Brown may have been mistaken about where one particular item was found hardly seems to undercut his detailed testimony about Wharton's arrest and interrogation.

Lastly, there is Wharton's allegation that Cannon should have interviewed Young before trial. Had Cannon done so, Young presumably would have complied with the trial court's sequestration order, and that court would not have needed to instruct the jury that her presence in the courtroom during Brown's testimony was a "factor" that should be taken "into consideration in evaluating [her] credibility." (App. at 2429.) But given Brown's detailed account and Young's obvious bias in favor of Wharton, it is highly unlikely that the jury's verdict hinged on that brief (and relatively innocuous) instruction.

We cannot conclude that, had Cannon done all of the above, there is a reasonable probability that the jury would have found Wharton's confession to be involuntary. Furthermore, as the District Court observed, the Commonwealth's case-in-chief at trial "was comprised of significantly more than [Wharton's] confession." (Id. at 63-64.) The Commonwealth's other evidence established Wharton's ill-will toward the Harts (particularly Bradley), Wharton's history of escalating crimes against them, his possession of items stolen from the Harts during the January 1984 home invasion (including the check from Bradley for the money that Wharton believed that he was owed), and Wharton's conversation with Nixon indicating that Wharton and Mason could

15

not go through with killing Lisa. Because there is no reasonable probability that the outcome of Wharton's trial would have been different had Cannon done everything outlined here, we will affirm the District Court's denial of this claim.

## III. Wharton's Confrontation Clause Claim

We next consider Wharton's claim that his Confrontation Clause rights were violated. As noted above, Mason's confession inculpated Wharton, and vice versa. The trial court admitted a redacted version of each confession, with the phrase "the other guy" replacing references to the name of the co-defendant in question.

During Brown's redirect examination at trial, he was asked why Larue Owens (a participant in two of the burglaries) had not been a suspect in the murder case. Brown answered: "Because the two defendants implicated each other in their statements." (Id. at 2046.) Both defense counsel immediately objected and moved to strike this testimony. The trial court granted that motion and then held a sidebar, where both defense counsel moved for a mistrial. The trial court denied a mistrial, instead opting to instruct the jury as follows: "Ladies and gentlemen, as to the last question and answer, you will strike that from your memory. It has absolutely no relevance in deciding this case. Do not consider that in any way in your verdict or arriving at your verdict." (Id. at 2050.)

On direct appeal, Wharton challenged the denial of a mistrial, as well as the admission of Mason's confession. The PSC rejected this claim, determining that any violation of Wharton's Confrontation Clause rights was harmless in light of the trial

16

court's cautionary instruction and the overwhelming evidence of his guilt.  See

Wharton I, 607 A.2d at 718-19.  On habeas review, the District Court, applying 28 U.S.C.

§ 2254(d)'s deferential standard of review, concluded that the PSC's harmlessness

determination was not unreasonable.

"The test for whether a federal constitutional error was harmless depends on the

procedural posture of the case."  Davis v. Ayala, 135 S. Ct. 2187, 2197 (2015).  On

habeas review, the proper test is whether the error "had substantial and injurious effect or

influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623

(1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  The Supreme

Court has explained that the Brecht standard "subsumes" § 2254(d)'s requirements for

reviewing state court merits decisions, and that a habeas court need not conduct a formal

analysis under both Brecht and § 2254(d).  See Davis, 135 S. Ct. at 2198.  Thus, although

the District Court reviewed Wharton's Confrontation Clause claim under § 2254(d), our

review here will focus on whether he has met the Brecht standard.  See id. at 2199

(explaining that "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*").

To satisfy Brecht, "[t]here must be more than a 'reasonable possibility' that the

error was harmful."  Id. at 2198 (quoting Brecht, 507 U.S. at 637).  However, if the

habeas court is in "grave doubt" as to whether an error had a substantial and injurious

effect or influence in determining the jury's verdict, the error cannot be deemed harmless.

See O'Neal v. McAninch, 513 U.S. 432, 445 (1995).  Wharton argues that, for four

17

reasons, the alleged Confrontation Clause violations were not harmless under Brecht. We consider these arguments in turn.

First, Wharton contends that the admission of Mason's confession undermined his (Wharton's) attack on the voluntariness of his own confession. To be sure, the admission of Mason's confession did not bolster that attack.[10] However, for the reasons previously discussed in Section II, the attack would have failed regardless of whether Mason's confession was admitted.

Second, Wharton asserts that he was prejudiced by Mason's confession because it indicated that it was his (Wharton's) idea to kill the Harts. But it does not matter, from a legal standpoint, with whom the idea to kill the Harts originated. The jury found that both Wharton and Mason possessed the specific intent to kill each victim.

Third, Wharton claims that without Mason's confession (which identified Wharton as Bradley's killer), there was no evidence that Wharton possessed the specific intent to kill Bradley. Wharton is mistaken. During Wharton's custodial interrogation, he was asked, "[W]hy did you kill them?" (App. at 5247.) He responded: "Cause they knew me

---

[10] Wharton's confession largely overlapped — or "interlocked" — with Mason's confession. "'[I]nterlocking' bears a positively inverse relationship to devastation. A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects, the defendant's alleged confession." Cruz v. New York, 481 U.S. 186, 192 (1987). Nevertheless, the admission of a co-defendant's interlocking confession can still amount to harmless error. See id. at 193-94.

18

and would turn us in." (Id.)[11]  He also admitted that, after separating the Harts, he helped

Mason put duct tape around Bradley's face and neck.  Although Wharton may not have

been the one to actually kill Bradley, that did not prevent the jury from finding that

Wharton possessed the specific intent to kill him.  See Commonwealth v. Montalvo, 956

A.2d 926, 930 n.2 (Pa. 2008) ("Criminal liability for first-degree murder can be imposed

where the jury finds that a defendant, with the requisite specific intent to kill, committed

the crime either as a principal or as an accomplice.").  The Commonwealth argued at

closing that Mason killed Bradley and that Wharton was Mason's accomplice in this

crime, and the evidence at trial (aside from Mason's confession) supported that position.

Lastly, Wharton argues that Mason's confession prejudiced him at his second

penalty hearing.[12]  One of the aggravating factors that the jury found against Wharton

was that he had been convicted of another offense punishable by life in prison or death.

In other words, the fact that he had been convicted of two murders in this case weighed

against him at sentencing.  He now claims that this aggravating factor would not have

come into play in this case absent Mason's confession, for that confession was the only

---

[11] At trial, Brown read Wharton's confession into the record.  Although Brown did not
recite the above-noted question verbatim — Brown said, "[W]hy did you kill her?" (App.
at 1828) — Brown did recite Wharton's corresponding answer verbatim, and it is
apparent from this answer that Wharton was referring to both victims.
[12] Contrary to the Commonwealth's contention, Wharton did raise this argument in the
District Court.  (See App. at 4197.)

evidence that he (Wharton) killed Bradley. This argument is meritless; as just discussed, Wharton himself did not need to kill Bradley to be convicted of Bradley's murder.

In sum, Wharton's <u>Brecht</u> arguments do not give us grave doubt as to whether the alleged Confrontation Clause errors had a substantial and injurious effect or influence in determining the jury's verdict in this case. Assuming for the sake of argument that his Confrontation Clause rights were indeed violated, we conclude that the impact of that error was not substantial and injurious because it was dwarfed by the weighty evidence demonstrating his guilt for the murders of both Bradley and Ferne. Because any violation of Wharton's Confrontation Clause rights was harmless under <u>Brecht</u>, we will affirm the District Court's denial of this claim.[13]

## IV. Wharton's Claim that Cannon was Ineffective at the Second Penalty Hearing

### A. Claim Background

Pennsylvania is a "weighing state" for purposes of penalty hearings in capital cases. <u>See</u> <u>Jermyn v. Horn</u>, 266 F.3d 257, 309 (3d Cir. 2001). In other words, the jury "determine[s] which statutorily defined aggravating factors have been proven beyond a reasonable doubt and weigh[s] those factors against the mitigating factors the defendant

---

[13] To the extent that Wharton argues that he should be granted habeas relief based on the cumulative effect of the errors alleged in his two guilt-phase claims, we find this argument unpersuasive. He has not met the standard for prevailing on a cumulative-effect claim. <u>See</u> <u>Collins v. Sec'y of Pa. Dep't of Corr.</u>, 742 F.3d 528, 542 (3d Cir. 2014) (explaining that, to prevail on such a claim, the errors in question, when considered together, must have "had a substantial and injurious effect or influence in determining the jury's verdict") (quoting <u>Fahy v. Horn</u>, 516 F.3d 169, 205 (3d Cir. 2008)).

has proven by a preponderance of the evidence." Id. (citing 42 Pa. Cons. Stat. Ann. § 9711(c)(iii), (iv)). "The jury's decision on the penalty must be unanimous." Id.

At Wharton's second penalty hearing (which was held about seven years after the first penalty hearing), several of his family members testified on his behalf. The takeaways from that testimony were that Wharton's childhood was unremarkable, that he had good qualities, and that his family cared about him. The Commonwealth, meanwhile, presented evidence of the history between Wharton and the Harts, as well as "the grisly evidence regarding [his] involvement in the murders." (App. at 110.)

The jury started deliberating in the late afternoon on December 21, 1992. Less than an hour later, the trial court recessed for the day. Toward the end of the next day, the jury submitted a note indicating that it was unable to reach a unanimous verdict. The trial court told the jury that "you have not deliberated nearly long enough," and instructed the jury to resume its deliberations at 9:30 the following morning. (Id. at 3992.) At 3 p.m. the next day, the jury returned a verdict of death on both murder counts. For each count, the jury found two aggravating factors (the murder was committed while perpetrating a felony, see 42 Pa. Cons. Stat. Ann. § 9711(d)(6), and Wharton was convicted of another offense punishable by life in prison or death, see 42 Pa. Cons. Stat. Ann. § 9711(d)(10)) and one mitigating factor (Pennsylvania's "catch-all" mitigating

21

factor, see 42 Pa. Cons. Stat. Ann. § 9711(e)(8)[14]), and concluded that those two aggravating factors outweighed the lone mitigating factor.

At the PCRA stage, Wharton alleged that Cannon was ineffective at the second penalty hearing for failing to obtain and present evidence reflecting Wharton's positive adjustment to prison life during the seven years between his two penalty hearings. In support of this claim, Wharton provided his prison records for that time period, as well as a declaration from Harry Krop, Ph.D., a licensed psychologist who, at some point after the second penalty hearing, interviewed Wharton and reviewed the prison records. Dr. Krop's opinion was that (1) Wharton's crimes were "anomalous and out-of-character," (2) "Wharton made a positive adjustment to prison life" during the time between his two penalty hearings, (3) "he would be a prime candidate for constructive rehabilitation in the general prison population," and (4) "he would not pose a future danger to the prison community in the event he were to serve a [life] sentence." (App. at 4655, 4657.)

The PCRA court dismissed this claim without a hearing. The PSC then upheld that dismissal on appeal, indicating that this claim failed on the merits because Wharton had not demonstrated that Cannon had acted unreasonably or that Wharton had suffered

---

[14]This mitigating factor gives weight to "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Cons. Stat. Ann. § 9711(e)(8). In finding this factor, the jury in Wharton's second penalty hearing noted that he had not killed Lisa, that he "was a good family member," and that he "cooperated fully with the police department concerning the crime." (App. at 4002-03.) The jury was able to make this finding about cooperation because no evidence about the circumstances of Wharton's arrest was presented at the second penalty hearing.

prejudice.  See Wharton III, 811 A.2d at 988-89.  On habeas review, the District Court focused solely on Strickland's prejudice prong, concluding that this claim failed because the PSC's prejudice determination was not unreasonable under § 2254(d).

As explained below, we disagree with the District Court's resolution of this claim. We hold that both of the PSC's bases for rejecting this claim represent an unreasonable application of Strickland, and our de novo review of this claim reveals that it is appropriate to remand the claim to the District Court for an evidentiary hearing.

B.      Analysis of the PSC's Decision

In concluding that this claim failed under Strickland's performance prong, the PSC appeared to rely on the following:  (a) Wharton's prison records "cut both ways"; and (b) Cannon presented other evidence that led the jury to find the catch-all mitigating factor.  See id.  But these points do not necessarily render Cannon's performance reasonable.  If, for example, Cannon simply neglected to seek out the prison records, his conduct could be deemed unreasonable regardless of whether the records were particularly helpful or whether he presented other mitigating evidence to the jury.  See Williams v. Taylor, 529 U.S. 362, 396 (2000) (explaining that counsel has an "obligation to conduct a thorough investigation of the defendant's background"); see also Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").  Without knowing whether Cannon even considered

23

obtaining the prison records, neither the content of those records, nor the presence of other evidence, could serve as the basis for rejecting Wharton's claim on Strickland's performance prong.[15]   Accordingly, we conclude that the PSC's application of that prong was unreasonable.

The PSC's application of Strickland's prejudice prong fares no better.  The PSC's analysis of this prong was brief:

> [I]t is notable that the equivocal prison record evidence, had it been introduced, would have sounded under the catch-all mitigating circumstance, which the jury in fact found . . . . [Wharton] has not demonstrated that he was prejudiced by [Cannon's] failure to introduce this equivocal prison record evidence as additional proof of this mitigating circumstance found by the jury.

Wharton III, 811 A.2d at 989.

---

[15] In its discussion of Strickland's performance prong, the PSC also stated, parenthetically, that Wharton had not made a proffer as to what Cannon would say in response to the allegations of ineffectiveness.  See Wharton III, 811 A.2d at 988.  We do not read that brief parenthetical as constituting a freestanding basis for the PSC's conclusion that Wharton failed to satisfy Strickland's performance prong.  The PSC also mentioned, in a footnote, Wharton's failure to comply with Pennsylvania Rule of Criminal Procedure 902(A)(15)'s requirement that a request for an evidentiary hearing be accompanied by a signed certification providing the substance of each witness's testimony.  See id. at 989 n.12.  But that rule, which was formerly numbered 1502(A)(15), was not enacted until after the PCRA court denied Wharton's petition.  Given that timeline of events, Wharton could hardly be faulted for not complying with that rule.  The Commonwealth now argues that Wharton failed to comply with a rule that was in place when he filed his PCRA petition.  Specifically, the Commonwealth points to Rule 902(D) (formerly numbered Rule 1502(D)), which states that a prisoner shall attach to his petition affidavits or other evidence that supports his claims (or explain why that evidence is not attached).  But because the PSC did not base its Strickland performance analysis on Rule 902(D), that rule is irrelevant here.

24

The PSC's prejudice analysis seems to suggest that any prison record evidence would have been cumulative because the jury had already found the catch-all mitigating factor. Such a suggestion would be persuasive if the weighing of aggravating and mitigating factors involved simply counting those two sets of factors to see which set was greater in number. But that is not the process in Pennsylvania, for the PSC itself has explained that the weighing process "involves a qualitative, not quantitative, analysis." Commonwealth v. Peoples, 639 A.2d 448, 451 (Pa. 1994) (emphasis omitted). In other words, a jury need not give the same amount of weight to each factor that it finds, and it is certainly possible that a jury's receipt of additional evidence regarding a particular factor would cause one or more jurors to assign more weight to that factor. Therefore, the PSC's analysis here is fundamentally flawed and cannot serve as the basis for rejecting a claim under Strickland. Indeed, the PSC itself has recently held as much, overruling its prior decisions in Commonwealth v. Rios, 920 A.2d 790, 812-13 (Pa. 2007), and Commonwealth v. Marshall, 812 A.2d 539, 548-49 (Pa. 2002), which had held "that counsel cannot be deemed ineffective for failing to present additional catchall mitigating evidence where the jury found the catchall mitigator based on other evidence presented by counsel during the penalty hearing." Commonwealth v. Tharp, 101 A.3d 736, 773 n.28 (Pa. 2014).[16] Accordingly, we conclude that the PSC's prejudice analysis

---

[16] In Tharp, four of the seven justices voted to overrule Rios and Marshall, and they did so in concurring opinions. See 101 A.3d at 775 (Castille, C.J., concurring, joined by Eakin, J.); id. at 777 (Saylor, J., concurring, joined by Eakin, J., and Todd, J.).

25

constitutes an unreasonable application of <u>Strickland</u>.[17]  In light of this conclusion, we must now examine this claim de novo to determine whether Wharton is entitled to habeas relief.  See <u>Breakiron v. Horn</u>, 642 F.3d 126, 138 (3d Cir. 2011).

## C.     De Novo Review of Wharton's Penalty-Phase Claim

To prevail on this claim, Wharton must show that (1) Cannon acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence, and (2) had Cannon presented that evidence at the second penalty hearing, there is a reasonable probability that at least one juror would have voted against imposing the death penalty.  See <u>Blystone v. Horn</u>, 664 F.3d 397, 426-27 (3d Cir. 2011).  To help make this showing, Wharton asked the District Court for an evidentiary hearing.  The District Court

---

[17] As indicated earlier, the District Court concluded that the PSC's decision was not an unreasonable application of <u>Strickland</u>'s prejudice prong.  However, in reaching that conclusion, the District Court did not actually rely on the PSC's prejudice analysis. Instead, the District Court looked to the PSC's discussion of <u>Strickland</u>'s performance prong, specifically the PSC's determination that the prison records "cut both ways."  The District Court's approach was error, for it effectively deferred to the PSC based on a rationale that was different than the reason actually given by the PSC.  See <u>Richter</u>, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."); <u>see also</u> <u>Hittson v. Chatman</u>, 135 S. Ct. 2126, 2127-28 (2015) (Ginsburg, J., joined by Kagan, J., concurring in the denial of certiorari) ("*Richter* makes clear that where the state court's real reasons can be ascertained, the § 2254(d) analysis can and should be based on the actual 'arguments or theories [that] supported . . . the state court's decision.'") (quoting <u>Richter</u>, 562 U.S. at 102); <u>Dennis v. Sec'y Pa. Dep't of Corr.</u>, 834 F.3d 263, 281-82 (3d Cir. 2016) (en banc) ("While we must give state court decisions the benefit of the doubt . . ., federal habeas review does not entail speculating as to what other theories could have supported the state court ruling when reasoning has been provided . . . .") (internal quotation marks omitted).

denied this request, stating that (1) a hearing on this claim was barred by Cullen v. Pinholster, 563 U.S. 170 (2011), and (2) even if Pinholster did not apply here, it would still deny a hearing as to this claim because he failed to make a prima facie showing of a constitutional violation. As explained below, we disagree with both of these determinations, and we conclude that an evidentiary hearing is warranted on this claim.[18]

In Pinholster, the Supreme Court held that a habeas court's review of a claim under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." Id. at 181. But when, as here, the state court's decision is unreasonable under § 2254(d), Pinholster does not prevent a federal habeas court from holding an evidentiary hearing as part of its de novo review. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015) (noting that "federal habeas courts may 'take new evidence in an evidentiary hearing' when § 2254(d) does not bar relief") (quoting Pinholster, 563 U.S. at 185). In deciding whether to hold such a hearing, a federal habeas court must consider (1) "whether the petition presents a *prima facie* showing which, if proven, would enable the petitioner to prevail on the merits of the asserted claim," and (2) "whether the relevant factual allegations to be proven at the evidentiary hearing are 'contravened by the existing record' or the record 'otherwise precludes habeas relief[.]'" Lee v. Glunt, 667 F.3d 397, 406-07 (3d Cir. 2012) (alteration in original) (quoting Palmer

---

[18] Although "[w]e review the District Court's denial of an evidentiary hearing in a *habeas* case for abuse of discretion," United States v. Lilly, 536 F.3d 190, 195 (3d Cir. 2008), "our consideration of the District Court's legal conclusions [undergirding that decision] is

27

v. Hendricks, 592 F.3d 386, 393 (3d Cir. 2010)). For the reasons that follow, we conclude that Wharton has made this prima facie showing, and the record does not preclude granting habeas relief on this claim.

"[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." Skipper v. South Carolina, 476 U.S. 1, 7 (1986). As a result, a defense attorney has a duty to obtain a capital defendant's prison records "as part of the 'obligation to conduct a thorough investigation of the defendant's background,'" Blystone, 664 F.3d at 422-23 (quoting Williams, 529 U.S. at 396). Wharton alleges that Cannon failed to obtain those records in this case, and nothing in the habeas record contradicts that allegation. If Wharton is given an opportunity to question Cannon in an evidentiary hearing — Cannon has yet to testify about this evidence — Wharton may be able to show that Cannon acted unreasonably. See id. at 420 ("[I]f counsel has failed to conduct a reasonable investigation to *prepare* for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing."). Accordingly, we conclude that Wharton has made a prima facie showing under Strickland's performance prong.

As for Strickland's prejudice prong, to determine whether Wharton's proffered evidence had a reasonable probability of changing at least one juror's vote, "we must

plenary," Morris v. Beard, 633 F.3d 185, 193 (3d Cir. 2011).

reconstruct the record and assess it anew.  In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony."  Williams v. Beard, 637 F.3d 195, 227 (3d Cir. 2011).

Wharton's prison records for the time between his two penalty hearings consist primarily of (1) his prison grievances and the prison's responses to them, and (2) one-page monthly evaluations prepared by the prison's Program Review Committee ("PRC").[19]  Wharton submitted a number of grievances, some of which were trivial.[20]  At first, one might very well conclude that these grievances would not help his case for mitigation.  However, Dr. Krop's declaration suggests otherwise, for he averred that "[t]hese grievances exhibit concern over the day-to-day details of his incarceration, which, from a psychological perspective, is significant as demonstrating a relative acceptance of [Wharton's] incarceration.  Such acceptance is an important element of his adjustment and shows that he will likely not be a future danger."  (App. at 4656.)

---

[19] The prison records also include periodic reports prepared by a psychiatrist, but those reports are very short (a few sentences or less) and really do nothing more than indicate that Wharton "has no evidence of a treatable mental disorder."  (App. at 4911.)

[20] Wharton's grievances included, inter alia, "complaints that a corrections officer's morning wake-up call was too loud; that he did not receive jelly with his toast; that corrections officers were 'whistling . . . early in the morning[;]' and that he did not receive his 'daily newspaper' on two occasions."  (App. at 112 (alteration in original) (quoting Wharton's prison records).)

29

As for the monthly PRC evaluations, a few of them contain negative information about Wharton.[21] Most of those evaluations, however, were positive. Although they were brief and did not provide much in the way of specifics, they indicated that Wharton was adjusting well to prison life and that his behavior was generally satisfactory. Of course, had Wharton presented the testimony of Dr. Krop (or a similar expert witness), the Commonwealth might have countered with other evidence, including an expert holding a contrary opinion. To date, though, the Commonwealth has yet to proffer any such testimony.

We recognize that Wharton's proffered evidence does, at least to a degree, "cut both ways." But in light of the positive elements of that evidence and the fact that the jury at the second penalty hearing was deadlocked at one point, we conclude that Wharton has made a prima facie showing under Strickland's prejudice prong. That is, he has made a prima facie showing that there is a reasonable probability that at least one juror would have changed his or her vote if presented with this evidence.

---

[21] In its June 1988 evaluation, the PRC noted that Wharton had been given a "reprimand and warning" for an unspecified misconduct. (App. at 4831.) In April 1989, the PRC noted that he had recently received a misconduct for circulating a petition about phone call privileges. In September 1989, the PRC reviewed "very serious misconducts," noting that he was "less than truthful . . . and denied having anything to do with the confiscated weapon or handcuff key." (Id. at 4845.) In December 1989, the PRC noted "past misconducts for abusing/modifying his antennas." (Id. at 4848.) In January 1990, the PRC stated that Wharton "refused to even discuss why he had pieces of aerial and two lengths of antenna. He said he didn't have to. He did the time." (Id. at 4849.) It appears that Wharton was placed in "D.C. Close" custody for about five months as a result of one or more of these misconducts. (See id. at 4844.)

Wharton must clear one more hurdle before he would be entitled to an evidentiary

hearing on this claim. Section 2254(e)(2) "bars a federal habeas court from holding an

evidentiary hearing unless the petitioner was diligent in his attempt to develop a factual

basis for his claim in the state court proceedings." Lee, 667 F.3d at 405-06 (internal

quotation marks omitted).[22] This diligence requirement "asks only whether 'the prisoner

made a reasonable attempt, in light of the information available at the time, to investigate

and pursue claims in state court.'" Lark v. Sec'y Pa. Dep't of Corr., 645 F.3d 596, 614

(3d Cir. 2011) (quoting Williams, 529 U.S. at 435). In this case, Wharton's timely,

counseled PCRA petition explicitly requested an evidentiary hearing. When the PCRA

court denied that petition without a hearing, he appealed and also filed a motion to

reargue. These efforts are sufficient to satisfy § 2254(e)(2)'s diligence requirement. See

Thomas v. Varner, 428 F.3d 491, 498 (3d Cir. 2005) ("Thomas requested an evidentiary

hearing before the Commonwealth PCR court . . . . The hearing was denied, and

therefore Thomas is not at fault for failing to develop the factual basis for his claim.");

see also Williams, 529 U.S. at 437 ("Diligence will require in the usual case that the

prisoner, at a minimum, seek an evidentiary hearing in state court in the manner

---

[22] "[O]ur jurisprudence applying § 2254(e)(2) remains applicable 'where § 2254(d)(1) does not bar federal habeas relief.'" Brown v. Wenerowicz, 663 F.3d 619, 629 n.4 (3d Cir. 2011) (quoting Pinholster, 563 U.S. at 185).

31

prescribed by state law.").[23]  Accordingly, § 2254(e)(2) does not bar an evidentiary hearing in this case.

In sum, because Wharton has made a prima facie showing under Strickland and there is no bar to an evidentiary hearing in this case, we conclude that the District Court erred in denying his request for a hearing.  Therefore, we will vacate the District Court's denial of habeas relief on this claim and remand for a hearing.

## V.    Conclusion

Based on the foregoing, we will affirm in part and vacate in part the District Court's denial of Wharton's habeas petition, and we will remand this matter for further proceedings consistent with this opinion.[24]

---

[23] Although Wharton did not submit his documentary evidence on this claim until after the PCRA court issued its notice of intent to dismiss his PCRA petition, "[t]he state courts allowed this revision, and the Commonwealth has not challenged it." (Commonwealth's Br. 150.)

[24] Although Wharton's notice of appeal included a challenge to the District Court's denial of his motion to alter or amend its habeas decision, he has waived that challenge by failing to raise it in his appellate briefing.  See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994).  Even if Wharton had preserved this challenge, it would not have changed our resolution of the three claims at issue here.